MARY SHIELDS LAWSON and FRANK H. SHIELDS, Appellants, v. SUSAN B. CUNNINGHAM and JAMES H. LIPSCOMB.

In Banc, June 28, 1918.

1. **TRUST ESTATE: Power of Trustee to Invest, Sell and Reinvest.** A clause of a will read: "I devise to my son J. H. Field, as trustee for my daughter Lucy B. Shields, ten thousand dollars, which I wish him to invest in some safe stock, or in any way he may think best, and to pay over for the use of my daughter Lucy, the yearly profits, which it may produce, but the principal to remain for the use of her children; in case my daughter Lucy dies leaving no children, the money to return and be equally divided between my sons." *Held,* that this language conferred upon the trustee power to invest, sell and reinvest, in personal or real estate; and when the trustee invested the fund in land, by a conveyance which named him as grantee and as trustee for the uses and purposes in the clause mentioned, a life estate in Lucy and remainder in the chilren was not so created that the trustee could not thereafter sell the land and invest the fund in other property. The power to sell and reinvest was not exhausted by the one investment in land.

2. ————: ————: **Ultra Vires: Cure.** Even if it be conceded that, under said clause of the will, the trustee had no power to buy land, yet any subsequent act by which the wrong was righted and the trust fund returned intact into his hands was warranted and legally unobjectionable.

3. ————: **Substituted Trustee: Power to Sell Trust Land: Estoppel.** The *cestuis que trustent,* who, with actual notice, or with knowledge

Lawson v. Cunningham.

of facts demanding inquiry, have accepted the proceeds of a sale of land by a substituted trustee, have solemnly receipted to him for the full amount of the trust fund and have enjoyed and retain the fruits of such sale, cannot be heard in a court of conscience to say that the substitued trustee, under a clause of a will giving the original trustee power to invest the trust fund in real estate, had no power to sell the land, or that the court of the foreign State appointing him had no power to approve his sale of Missouri land; and whether such doctrine of preclusion be designated as *quasi*-estoppel or is more nearly akin to ratification or election, the result is the same—they cannot, under such circumstances, recover the land.

*Held*, by BOND, C. J., dissenting, with whom BLAIR and WILLIAMS, JJ., concur, that the facts of the case do not show that the minor *cestuis que trustent* shared in the proceeds of the sale of the trust property by the substituted trustee, or that they had notice that when it was sold the proceeds were invested in other real estate the purchase price of which, when it was sold, was divided among them, nor do they show that it was so invested, and consequently the doctrine of *quasi*-estoppel does not apply to them.

Appeal from Boone Circuit Court.—*Hon. Samuel Davis*, Special Judge.

AFFIRMED.

*Finley & Sapp* and *Frank G. Harris* for appellants.

(1) The will created a trust fund during the life of Lucy B. Shields, in which her children took a contingent remainder. West v. Bailey, 196 Mo. 517; Wood v. Kice, 103 Mo. 329; Luquire v. Lee, 121 Ga. 624. (2) Under such a trust the trust property cannot be diverted from the objects named by the donor, and neither the trustee, nor Lucy B. Shields, nor both together, nor a court, had power to convey the property and defeat the rights of the remaindermen therein. Sampson v. Mitchell, 125 Mo. 217; West v. Bailey, 196 Mo. 517; Arnold v. Brockenbrough, 29 Mo. App. 625. (3) There is no express power of sale given the trustee, and even if it be granted that he had an implied power of sale, it was personal to J. H. Field and did not survive to a substituted trustee. Gamble

v. Gibson, 59 Mo. 595; 39 Cyc. 346, 410; De Lashmutt v. Teeter, 261 Mo. 437; Luquire v. Lee, 121 Ga. 624; Belote v. White, 39 Tenn. 703; Mitchell v. Spence, 62 Ala. 450; Hatt v. Hagaman, 33 N. Y. Supp. 5; Flint v. Spurr, 56 Ky. 499; Kennedy v. Pearson, 109 S. W. 280; Potter v. Ranlett, 116 Mich. 454; Goad v. Montgomery, 119 Cal. 552. (4) When the portion of the trust fund was invested in the real estate in controversy, such real estate became subject to the trust. Freeman v. Maxwell, 262 Mo. 21; Wood v. Kice, 103 Mo. 336. And the insertion in the deed from Jacobs to Wm. C. Shields, as trustee, in the *habendum* clause, of the added power of sale was unauthorized by the trust instrument, and therefore void. Freeman v. Maxwell, 262 Mo. 24; Clark v. McGuire, 16 Mo. 312; Henderson v. Williams, 97 Ga. 709. (5) Under the trust as declared, upon the death of the life tenant, the remaindermen would have a right of entry. Garesche v. Levering Inv. Co., 146 Mo. 449; Rector v. Dalby, 98 Mo. App. 198; Pugh v. Hays, 113 Mo. 434; 28 Am. & Eng. Ency. Law, p. 947. (6) The deed from Curtis Field, trustee, and Lucy B. Shields to Elijah A. More did not convey the title of the remaindermen. Such trustee, appointed by the circuit court of Madison County, Kentucky, had no power to convey real estate in Missouri and the deed for that reason is void, so far as the remaindermen are concerned. De Lashmutt v. Teeter, 261 Mo. 412; Case note, 69 L. R. A. 673. So far as these remaindermen are concerned, consent by William C. Shields, trustee, and Lucy B. Shields could not give the trustee power to convey or confer jurisdiction on the circuit court of Madison County, Kentucky, to convey land in Missouri. In Re Drainage Dist. v. Voltmer, 256 Mo. 162; 11 Cyc. 673; Vandeventer v. Bank, 232 Mo. 618. (7) The Statute of Limitations has no application to this case. The answer of defendant Susan B. Cunningham shows on its face that she claims by mesne conveyances from Elijah A. More; that she claims under the trust, not adversely to it. Therefore, as to her and her predeces-

sors· in title, the Statute of Limitations never commenced to run during the life of Lucy B. Shields. Goodwin v. Goodwin, 69 Mo. 621; 1 R. C. L., p. 754, sec. 80. The Statute of Limitations must be pleaded in order to be available as a defense. Stevenson v. Smith, 189 Mo. 466; Chouteau v. Allen, 70 Mo. 341. Furthermore, persons dealing with a trust fund do so at their peril, and purchasers from the trustee or life tenant are not innocent purchasers where the record under which they claim discloses the character of the fund or property involved, and one who acquires property with notice, either actual or constructive, that his grantor holds title as trustee, stands in his grantor's shoes and holds the property charged with the trust. McDonald v. Quick, 139 Mo. 498; Turner v. Edmonston, 210 Mo. 427; 39 Cyc. 376, 565; Griswold v. Perry, 7 Lans. (N. Y.) 98; Elliott v. Machine Co., 236 Mo. 546; Case v. Goodman, 250 Mo. 112;· Canada v. Daniel, 175 Mo. App. l. c. 65. The interest of Lucy B. Shields and her trustee having been conveyed by them, she and her trustee estopped themselves from suing for possession of the property or the annual rents, and no limitation could run against the remaindermen by reason of the trustee being barred, even if it be conceded that the trustee held the fee simple title. Kingman v. Winchall, 20 S. W. (Mo.) 296; Heaton v. Dickson, 153 Mo. App. 312; Pickens v. Dorris, 20 Mo. App. 1; Wood v. Kice, 103 Mo. 338; Harris v. Smith, 98 Tenn. 286; Security Bank v. Callahan, 220 ·Mass. 84; Boston Trust Co. v. Luke, 220 Mass. 484; Mannagan v. Shea, 158 Wis. 619; 1 Cyc. 1069. In this case the trustee did not take a fee simple, but only a life estate in the fund or property, during the life of Lucy B. Shields. Therefore, since the trustee and Lucy B. Shields were tenants for life only, whatever they did or did not do could not affect the rights of the contingent remaindermen. In Re Spreckel's Estate, 123 Pac. (Cal.) 371; Luquire v. Lee, 121 Ga. 624; Brown v. Richter, 49 N. Y. Supp. 368; Dresser v. Travis, 79 N. Y. Supp. 928; Losey v. Stanley, 147

N. Y. 560; Belote v. White, 39 Tenn. 703; Bull v. Walker, 71 Ga. 195, Hill on Trusts (4 Am. Ed.), p. 382; 39 Cyc. 212, 213; Harbison v. James, 90 Mo. 427; In Re Soulard Estate, 141 Mo. 663; Throckmorton v. Pence, 121 Mo. 50; Dameron v. Jamison, 143 Mo. 483; Snyder v. Elliott, 171 Mo. 362; Starr v. Bartz, 219 Mo. 47, 63. (8) The plaintiffs have not ratified the sale to More by taking the proceeds of the Christian College avenue property. Estoppel must be pleaded and proved as pleaded. Turner v. Edmonston, 210 Mo. 428; Noble v. Blount, 77 Mo. 242. The evidence on the plea of ratification or estoppel failed to show that the trustee invested the trust funds from the More sale in the Christian College avenue property. Anthony v. Building Co., 188 Mo. 718; Bank v. Simpson, 152 Mo. 656; Stokes v. Burns, 132 Mo. 214; Luquire v. Lee, 121 Ga. 624. If, without knowledge of the facts and of their rights, the plaintiffs have received a part of the proceeds of the sale to More, then they should be permitted to return the same as a condition to a decree vesting title in them. De Lashmutt v. Teeter, 261 Mo. 447; Sampson v. Mitchell, 125 Mo. 232. The finding of the court on this issue was erroneous because the evidence shows that the defendant never changed her position on atccount of the alleged division of the Christian College avenue property proceeds. De Lashmutt v. Teeter, 261 Mo. 439.

*McBaine & Clark* for respondents; *Henry Lamn* of counsel.

(1) The trust created by the will of Curtis Field was a trust of money, to-wit, ten thousand dollars. Under the terms of the trust the trustee had implied power to sell anything he bought with the money and give good title thereto. The power "to invest" and "to pay over" the income with a provision that "the money to return and be equally divided" among other persons gives an implied power to sell anything bought with the money. The power of sale exercised by

Curtis Field, Jr., is derived from the will. The sale is therefore valid. 39 Cyc. 351; 2 Perry on Trusts (6 Ed.), 1269; Porter v. Schoffield, 55 Mo. 303; Livingston v. Murry, 39 How. Pr. 102; Wurts v. Page, 19 N. J. Eq. 365; McCredie v. Metropolitan Ins. Co., 83 Hun. 526, 32 N. Y. Supp. 489, 148 N. Y. 761; Wright v. Mercerin, 34 Misc. 414, 69 N. Y. Supp. 936; Purdy v. Whitney, 20 Pick. 25; Powell v. Woodcock, 149 N. C. 235; Asch v. Asch, 47 Hun, 285, 113 N. Y. 232; Mendall v. Levice, 48 Misc. 271, 81 N. Y. Supp. 965; Byrnes v. Bayer, 86 N. Y. 210; Scottish American Mortgage Co. v. Massy, 94 Tex. 339; First National Bank v. Lee, 23 Ky. Law Rep. 1897; Webster v. Morris, 66 Wis. 366, 57 Am. St. Rep. 278; Burnham v. White, 102 N. Y. Supp. 717; In re Musten, 194 Pa. 437, 75 Am. St. 702; Cherry v. Green, 115 Ill. 591; Robinson v. Robinson, 105 Me. 68, 134 Am. St. 537; Harvard College v. Wells, 159 Mass. 114; Schloendorn v. Schmidt, 115 Md. 74; Boston Safe Deposit Co. v. Mixter, 146 Mass. 100; Holden v. Circleville Light Co., 216 Fed. 497. (2) The appointment of Curtis Field, who sold the land in question, was valid. While the real estate purchased by him was in Missouri, the trust fund invested in it was created by a Kentucky testator, and the fund was under the control of the circuit court of Madison County, Kentucky. The land was a part of the fund in charge of that court through its trustee. When the trustee died his successor was properly appointed for the entire fund. 39 Cyc. 287; Wheelen v. Kellner, 31 Ky. Law Rep. 1285; Dexter v. Cotting, 149 Mass. 92; Bradstreet v. Butterfield, 129 Mass. 339; Thomas v. Poole, 19 S. C. 323; Fitzgibbon v. Barry, 78 Va. 755; Haggins v. Straus, 91 Cal. 191, 25 Am. St. 171; Milbank v. Crane, 25 How. Pr. 193; Hawley v. Ross, 7 Paige, 103; Chase v. Chase, 2 Allen, 101; Curtis v. Smith, 60 Barb. 9; Donaldson v. Allison, 182 Mo. 627; Jenkins v. Lester, 131 Mass. 357; Smith v. Davis, 90 Cal. 25, 25 Am. St. 92; Pennington v. Smith, 69 Fed. 188; Breedlove v. Stump, 3 Yerg. (Tenn.) 265. (3) The appointment by the Kentucky court is not subject to

collateral attack, in this case, though it be irregular. Trusts, 39 Cyc. 288; Dyer v. Leach, 91 Cal. 191, 25 Am. St. Rep. 717; Brandon v. Carter, 119 Mo. 572; Bredell v. Westminster College, 242 Mo. 333. (4) The sale of the land in question, by Curtis Field, Jr., passed the fee simple title thereto, freed from the trust, to Elijah A. More. This is true though the trustee had no right under the will to buy land in Missouri or power to sell the same. The trustee in this case sold the land and actually received double the money that he paid for the land. If he acted without authority in buying he acted properly in selling and converting the land back into money. This is not a trust of a particular piece of land, but, as stated, was a trust of money. The rules where a particular piece of land is left in trust are not applicable to cases where money is left in trust, and afterwards property is bought with the money, and afterwards the property is sold and converted back into money, which is received by the trustee. Purchase of land in Missouri by the trustee was probably not authorized by the will of Curtis Field, Sr. If the purchase was not authorized the trustee had the power to sell the land which he had purchased without authority. Ormasten v. Amscott, 84 N. Y. 399; In re Reid, 49 N. Y. App. Div. 196, 61 N. Y. Supp. 50; Roberts Estate, 22 Pa. Co. Ct. 4; State v. Washburn, 67 Conn. 188; Newton v. Rebenack, 90 Mo. App. 650. (5) The plaintiffs are barred by the Statute of Limitations. Where the statute has run against the trustee holding the legal title the beneficiaries are also barred even though they be under disabilities. Meeks v. Olpherts, 100 U. S. 564; Trimble v. Woodhead, 102 U. S. 647; Ewing v. Shannahan, 113 Mo. 188; Walton v. Ketchum, 147 Mo. 209; Schiffman v. Schmidt, 154 Mo. 204; Smillie v. Biffle, 2 Pa. St. 52; Johnson v. Cook, 122 Ga. 524; Cushman v. Coleman, 92 Ga. 772; Waterman v. Waterman Hall, 220 Ill. 567; Edwards v. Woolfolk, Adm., 17 B. Mon. 376; Chase v. Cartright, 53 Ark. 358, 22 Am. St. 207; 1 Cyc. 1068; 2 Corpus Juris, p. 227; 1 R. C. L., p. 754. (6) Plain-

tiffs are estopped from asserting title to the real estate in controversy. The plaintiff, Frank Shields, recognized the validity of the appointment of Curtis Field, trustee, and the sale of the property by him. He applied to the court for the appointment of himself as trustee to succeed said Curtis Field and in his application and receipt to the former trustee, impliedly acquiesced in the former sale and disposition of the purchase money. His co-plaintiff signed his bond as trustee. The plaintiffs are also estopped from asserting title to the real estate in controversy, because subsequently the real estate in which part of the money received from Elijah A. More was invested, was sold and the plaintiffs divided the purchase money among themselves. They can not receive the benefits of the sale to Moore and retain the same and repudiate the sale. Austin v. Loring, 63 Mo. 19; Light Co. v. Railroad Co., 89 Mo. 108; Cadematori v. Gauger, 160 Mo. 352; Hubbard v. Slavens, 218 Mo. 598; Hector v. Mann, 225 Mo. 228; Proctor v. Nance, 220 Mo. 104; McClannahan v. West, 100 Mo. 309; Cape Girardeau, etc. Co. v. Southern Illinois, etc. Co., 215 Mo. 296.

FARIS, J.—This is an action to determine title to certain real estate situate in Boone County, Missouri. Upon a trial by the court the finding and judgment were for defendants, and plaintiffs in the conventional way thereupon appealed.

The land in dispute is situate in the heart of the City of Columbia, and is a part of an eighteen-acre tract conveyed by one John J. Jacobs, to William C. Shields, trustee, on the 10th day of October, 1864, under the circumstances below set forth. In the year 1857, one Curtis Field, Sr., residing in Madison County, in the State of Kentucky, executed his will, and thereafter in the year 1863 departed this life. The only provision of this will with which we are here concerned is one which created a trust fund for his daughter. The provision so creating said fund read thus:

"I devise to my son, J. H. Field, as trustee for my daughter, Lucy B. Shields, ten thousand dollars, which I wish him to invest in some safe stock or in any way he may think best and to pay over for the use of my daughter Lucy the yearly profits which it may produce, but the principal to remain for the use of her children in case my daughter Lucy dies leaving no children, in that event the money to return and be equally divided between my sons, John H. Field, Curtis Field and Thompson Field, or their heirs."

At the time of the death of said Curtis Field, the daughter, as the clause quoted foreshadows, was intermarried with one William C. Shields, and was residing in Columbia, Missouri. The trustee named in said trust fund clause refused to act. Shortly thereafter such proceedings were had in the circuit court of Madison County, Kentucky, as resulted in the appointment of the husband of Lucy B. Shields, the said William C. Shields, as substituted trustee. After giving bond, which was approved by the Madison County Circuit Court, there was paid over to him on the 18th day of April, 1864, the full sum of the trust fund mentioned.

Shortly after the trust fund was paid into the hands of the substituted trustee, William C. Shields, he purchased from the said John J. Jacobs, in consideration of $6000, of said fund, the tract of land in controversy. This land consisted at the time of eighteen acres, and from it the parcel in controversy was carved. There were also carved from this tract twenty-seven other lots, now worth, with the improvements thereon, from three hundred and fifty thousand to four hundred thousand dollars. Of the twenty-eight lots, seventeen have been quit-claimed by plaintiffs to the claimants or to the occupants thereof, leaving, with the parcel here in dispute, only eleven lots involved in this action or in the result thereof. The deed ran to William C. Shields, as trustee, and, omitting formal parts, and certificates, which are conventional, read thus:

"Know all men by these presents that whereas Curtis Field, late of Madison County, Kentucky, by his last will and testament dated March 10th, 1857, duly probated and recorded in said county of Madison, devised to J. H. Field as trustee for his daughter Lucy B. Shields ten thousand dollars which said trustee was by said will directed to invest in stock or in any way that he, said trustee, might think best, and to pay over for the use of said Lucy B. Shields the yearly profits which it may produce, but the principal to remain for the use of the children of said Lucy; with the further provision in said will that 'in case my daughter Lucy died leaving no children the money to return and be equally divided between my sons John H. Field, Custis Field & Thompson Field, or their heirs';

"And whereas said John H. Field having failed to qualify as trustee, William C. Shields has been appointed by the circuit court of Madison county aforesaid, and has duly qualified as trustee for said Lucy B. Shields, under the will of said Curtis Field, dec'd. and has, in pursuance of the provisions of said will, invested the sum of six thousand dollars, part of bequest and devise aforesaid for the benefit of said Lucy B. Shields, in the real estate hereinafter described;

"Now therefore, we, John J. Jacobs and Jane W. Jacobs, his wife, in consideration of the premises and of the sum of six thousand dollars, to us in hand paid by William C. Shields, trustee as aforesaid, the receipt whereof is hereby acknowledged, do hereby bargain sell and convey unto said William C. Shields, trustee as aforesaid, the following real estate lying in Boone County, Missouri, to-wit:

"Part of the Northeast quarter of Section thirteen (13), Township Forty-eight (48), Range Thirteen (13), Beginning at a point two hundred (200) links west of a stone, the quarter section corner on the west boundary of Section 18, Township 48, Range 12, and running thence west 8.10 chains; thence north 10.10 chains to a stone, the southwest corner of a lot desig-

nated on the plat of the town of Columbia as Lot No. Seven (7); thence north along the west boundary of said Lot No. 7, and part of the west boundary of Lot No. 8, 12.25 chains to the northwest corner of said Shield's land hereby conveyed; thence east along the line between the land hereby conveyed and those of G. H. Matthews 8.10 chains; thence south 22.35 chains to the beginning, containing 18.01 acres, be the same more or less.

"To have and to hold the same with all the rights, privileges and appurtenances, thereto belonging or in any wise appertaining, unto said William C. Shields, trustee as aforesaid, for the use of said Lucy B. Shields during her life, and at her death the same to descend to and vest in the heirs of the body of said Lucy B. Shields, provided that if said Lucy B. Shields die leaving no children, then said real estate to vest in and be equally divided between John H. Field, Curtis Field, Thompson Field, or their heirs; *And provided further, that it shall be competent for said William C. Shields, as such trustee, and for any future trustee, successor of said Shields, who may be thereto requested by said Lucy B. Shields, at any time, to sell and convey the above described real estate, and re-invest the proceeds thereof* according to the directions of the will of said Curtis Field, dec'd.

"In testimony whereof we, said Jacobs and wife, hereto set our hands and affix our seals on this tenth day of October A. D. 1864."

Following the purchase of the above land (which we shall hereinafter refer to as the "Jacobs land," for brevity and to distinguish it from another tract in the case), Lucy B. Shields, and her husband, William C. Shields, the trustee, resided together thereon until the death of William C. Shields, in July, 1865. Upon the death of William C. Shields, the circuit court of Madison County, Kentucky, appointed James S. Rollins, as trustee. He refused to act, and thereupon the Kentucky court appointed Curtis Field, Jr., as trustee,

who duly qualified and took over the management of the trust fund.

In 1869, Curtis Field, the second substituted trustee, presented a petition to the circuit court of Madison County, Kentucky, praying for the approval of the sale of the Jacobs land. The Kentucky court thereupon made an order approving the sale thereof and ordering Curtis Field, as trustee, to execute a deed of conveyance therefor, and it was accordingly sold and conveyed by said trustee to one Elijah A. More, for the sum of $12,000, by deed bearing date July 1, 1869, in which Lucy B. Shields, as *cestui que trust*, joined. This deed recites at length the salient facts of the creation of the trust fund, and except for the description and granting parts thereof, which are conventional, reads thus:

"Know all men by these presents that Whereas Curtis Field late of Madison County, Kentucky, by his last will and testament dated March 10, 1857, duly probated and recorded in said county of Madison devised to J. H. Field as trustee for his daughter Lucy B. Shields ten thousand dollars which said trustee was by said will directed to invest in stock or in any way that he said trustee might think best and to pay over for the use of said Lucy B. Shields the yearly profits which it might produce but the principal to remain for the use of the children of the said Lucy B. Shields and Whereas said John H. Field having failed to qualify as Trustee and William C. Shields having been appointed by the circuit court of Madison County aforsaid and having duly qualified as trustee for said Lucy B. Shields under the will of said Curtis Field deceased and did in pursuance of the provisions of said will invest the sum of six thousand dollars part of the bequest and devise aforesaid for the benefit of said Lucy B. Shields in the real estate hereinafter described and which was conveyed to said William C. Shields trustee as aforesaid by John J. Jacobs and Jane W. his wife and Whereas it was provided in said deed of conveyance that it should be com-

petent for said William C. Shields as such trustee and
for any future trustee successor of said William C.
Shields when thereto requested by said Lucy B. Shields
at any time to sell and convey the said real estate
purchased as aforesaid and reinvest the proceeds of
such sale according to the directions of the will of
said Curtis Field deceased, and Whereas said William
C. Shields departed this life on the 3d day of July,
1865. And whereas I, Curtis Field was duly appointed
by the circuit court of said Madison County, Kentucky,
to succeed said William C. Shields deceased as trustee
of said Lucy B. Shields and having duly qualified as
such trustee and Whereas I am hereto requested by
said Lucy B. Shields as evidenced by her signing this
deed and becoming a party herein.''

Under the above conveyance, through divers mesne
conveyances not pertinent here, Susan B. Cunningham,
the defendant, claims title. The other defendant, James
R. Lipscomb, is made a party merely as the holder
of a certain deed of trust; he is not otherwise inter-
ested in this title. We shall hereafter refer to Susan
B. Cunningham as the defendant, and to the appellants
herein as plaintiffs.

After the sale of the Jacobs land, which was con-
summated, as stated, by deed of conveyance dated July
1, 1869, there was purchased, for the sum of $5,000,
from one Herndon, by Curtis Field, as trustee, another
tract of land, which tract we shall hereinafter refer to
as the ''Herndon land.'' The deed to the Herndon
land was made, as the deed itself recites, to *''Curtis
Field, trustee for Lucy B. Shields, and her children
acting under the will of Curtis Field, Sr., deceased.''*
This deed was dated July 1, 1869, but was not acknow-
ledged till July 3, 1869. Forty-one days after the deed
of conveyance of the Herndon land was made to Curtis
Field, trustee, to-wit, on the 13th day of September,
1869, ''Curtis Field, Jr., as trustee for Lucy B. Shields,
and her children,'' conveyed to Lucy B. Shields the
Herndon land, for a recited consideration of one dol-

lar. But this deed contained a further provision which is pertinent, and which reads thus:

"The main consideration of the foregoing conveyance is that the deed was made to Curtis Field, trustee, etc., by E. W. *Herendon* and Laura E. his wife, when it should have been made by them to Lucy B. Shields, she having paid for the property to *Herendon* out of her own individual profits of the trust fund received from her father Curtis Field's estate paid over to her by Curtis Field, trustee, aforesaid."

Light is thrown upon the recital above quoted from this deed, by the extrinsic facts shown in evidence. For the record shows that after the sale by the trustee, to E. A. More, of the Jacobs land, for the sum of $12,000, the sum of $6000, being, the amount of the trust fund invested in the Jacobs land, was retained by Curtis Field, as trustee. The difference, to-wit, the sum of $6000, was, pursuant to an order of the circuit court of Madison County, Kentucky, paid over to Lucy B. Shields, as "profit on purchase and sale of house and grounds in Columbia," as her filed receipt therefor recites.

Lucy B. Shields departed this life in the year 1910, leaving surviving her a daughter, Mary Shields, intermarried with one Lawson, Frank H. Shields and William C. Shields, Jr., who, except William Shields, Jr. (who, prior to the bringing of this suit, sold and conveyed by mesne conveyances to Mary Shields Lawson his interest in the land herein in dispute), are plaintiffs herein.

Subsequent to the purchase and payment for the Jacobs land, and on, to-wit, the 13th day of January, 1870, Curtis Field, as trustee, made a report to the circuit court of Madison County, Kentucky, in which he showed the sale of the Jacobs land, the profit of $6000 arising from such sale, and further set forth that *the trust fund was then invested in $4000 of the stock of the Knobnoster Savings Bank, $2000 in Boone County Agricultural bonds, and $4000 in bonds of the United States, together making up the full sum of the*

*trust fund of $10,000.* This report was accompanied by the receipt from Lucy B. Shields, for the sum of $6000, said therein to be profits arising from the sale of the Jacobs land.

Some five years after the making of the deed of conveyance by Curtis Field, trustee, to Lucy B. Shields, of the Herndon land, and, to-wit, on the 10th day of January, 1875, Lucy B. Shields reconveyed the Herndon land to "Curtis Field, trustee of Lucy B. Shields; etc., under the will of Curtis Field, deceased," for the recited consideration of $2000. This latter deed, except for the name and office of the grantee, is in conventional form, and nowhere recites any other reason or consideration for the making thereof, except the consideration of $2000 therein set forth.

Some time in the year 1875, but at what precise time does not appear, and whether before or after the making of the deed of conveyance by Lucy B. Shields to Curtis Field, trustee, does not, except by inference, appear, a report of this trust fund was filed by Curtis Field, in the circuit court of Madison County, Kentucky. This report then showed that *the trust fund* was still intact and that it was *invested in Boone County Agricultural bonds, the sum of $3000; the First National Bank of Knobnoster, the sum of $5000, and in "residence house and lot, Columbia, Missouri, $2000."* Thereafter reports of the condition of this fund were made in 1876, when the full sum of $10,000 was still shown to be in the trust fund; likewise a report was made in 1877, when a like condition was shown thereby to exist. On January 5, 1880, the report of the trustee shows that the trust fund was still on hand and invested, and intact, except that it shows that *Lucy B. Shields, was over-drawn $2028.05,* and that there was cash deposited in some bank in the sum of $1486.95. This report further showed that $2000 was still invested in a house and lot in Columbia.

On the 5th day of June, 1880, the plaintiff Frank H. Shields was by the court of common pleas of Madison County, Kentucky (to which court the matter had

been in the meantime transferred), appointed third substituted trustee, "in place of Curtis Field, resigned," and the order appointing plaintiff as such trustee recites that Curtis Field, having resigned, "*is released from the duties of trustee,* and having made a settlement before the master commissioner of his accounts, and the report of the master commissioner being hereby confirmed, and *Field is exonerated from responsibility* and the cause is ordered to be filed away." Plaintiff Frank H. Shields, as such trustee, thereupon made and entered into a bond in the sum of $2000, for the faithful performance of his duties as trustee of this fund. This bond was signed, among others, by Lucy B. Shields, the *cestui que trust,* and by Mary R. Shields, who is the other plaintiff herein.

Following the appointment of plaintiff Frank H. Shields as trustee, and on, to-wit, the 10th day of February, 1881, said Frank H. Shields, as trustee, executed and delivered a receipt to Curtis Field, as of date of August 2, 1880, wherein he recited the payment to him by said Curtis Field, of the full sum of $10,000, of said trust fund, as follows:

"Thirty-five shares Ex. Bank St.
    Louis in litigation (40 Pr. Ct.
    Pd.), ..................... $2,100.00;
    ($2,000.00) Johnston County T. P.
    Bonds, .................... 1,800.00;
Deed to house and lot Columbia, 3,290.00;
Cash check, ................... 2,750.00;
Do. Do., ...................... 60.00."

The record shows that the above receipt, as appears from a letter from plaintiff to Curtis Field, was written by plaintiff Frank H. Shields himself.

After the appointment of plaintiff Frank H. Shields as trustee, and after the lodging by him of his receipt for the trust fund in the Kentucky court, nothing further was done in court there or elsewhere touching this trust fund, until the April term, 1910, of the circuit court of Boone County, Missouri. On the

latter date, and subsequent to the death of Lucy B. Shields, plaintiffs, together with the said William C. Shields, presented a petition to the circuit court of Boone County, reciting all the pertinent facts, and asking that Frank H. Shields be by said circuit court appointed trustee of this estate, which was accordingly done. Thereafter plantiff Frank H. Shields qualified as trustee under the Missouri appointment, and on the 28th day of June, 1912, filed in the Boone County Circuit Court a report as trustee, wherein it appeared that he had sold the Herndon land for the sum of $6700, and after paying certain expenses, and deducting certain money, to-wit, the sum of $1411.20, advanced to Lucy B. Shields, *he had paid the balance to William C. Shields, to plaintiff Mary Shields Lawson, and to himself.* These payments, as appear by receipts accompanying his report and filed by him, show that each of the plaintiffs and William C. Shields received from the sale of said Herndon land the sum of $1529.95. The Herndon land was the sole asset shown by plaintiff Shields when he made his settlement as trustee in 1912, although when he was appointed by the Kentucky court in 1880 he receipted his predecessor for the full amount of the trust fund.

Such other facts as may be deemed necessary to an understanding of this case, will be found in the opinion.

To reverse the judgment below many points are urged upon our attention by plaintiffs, and to uphold it divers propositions both of law and equity are put forward by defendant, and ably combated by plaintiffs. It occurs to us that the few questions which seem serious in the case may be discussed best and most easily by approaching the case from the standpoint of the defendant. For, if the learned trial judge has reached a just and equitable conclusion, it is our duty to sustain that conclusion if we can.

Among the propositions by which it is said by defendant the judgment *nisi* may be sustained, are: (a) that the Statute of Limitations had run when this suit

was begun by reason of more than forty-four years' adverse possession against the trustee in whom the legal title to the land was vested, and since the trustee is barred the *cestuis que trustent* are likewise barred; (b) that by the terms of the will of Curtis Field, the power was given to the trustee to invest, and sell and re-invest the trust fund (which, it is thus in effect urged is to be regarded throughout as money only), and since the fund was invested in land and the land thereafter sold at a profit and the fund withdrawn therefrom intact, the transaction left no imprint of trust, on the land, or running with it; and (c) that plaintiffs are estopped for that they knowingly elected to take and appropriate to their own use the proceeds from the sale of the Herndon land which was bought with the identical money derived from the alleged void sale of the land in dispute. The latter proposition will be amplified and stated more at length when we come to discuss it.

For the present, at least, we pretermit any extended discussion of the effect, if any, of the Statute of Limitations to transfer, by almost half a century's possession, the title from the trustee to the defendant. We are wholly unable to see this suggestion in any light other than a flagrant begging of the question. Upon the theory of the case urged upon our attention by the defendant, the Statute of Limitations ran years ago; but upon the theory of plaintiffs, it did not begin to run at all till the death of the life tenant in 1910. When, upon consideration of other propositions in the case, we shall have decided which of these conflicting theories is correct, we shall have decided the case, without the necessity of invoking the Statute of Limitations. This for the reason that plaintiffs urge that when $6,000 of this trust fund was invested in land, (a) no further power of sale for re-investment existed, or was residual in the trustee, or in Curtis Field, the second substituted trustee, and alleged successor in that trust, and (b) that the Kentucky court had no

power to order, or to approve a sale of land in this State, and so the investment in land was upon the facts confronting us unalterable, and had the effect to create therein a life estate in Lucy B. Shields, with remainder in fee to plaintiffs. It follows, plaintiffs contend, that the Statute of Limitations was tolled as to these plaintiffs till the death of the life tenant. If this contention is correct the statute did not run; if it is for any reason incorrect these plaintiffs can not recover, and so defendant has no need to invoke the Statute of Limitations. So, in order to save time and space we pass to the second proposition, which is, we think, perforce interlinked with the contentions of plaintiffs, touching the third one and is largely dependent thereon.

Repeating the pertinent clause of the will and italicising it for emphasis, it read thus: "I devise to my son J. H. Field, as trustee for my daughter Lucy B. Shields, ten thousand dollars, *which I wish him to invest in some safe stock, or in any way he may think best,* and *to pay over* for the use of my daughter Lucy, *the yearly profits,* which it may produce but the principal to remain for the use of her children, in case my daughter Lucy dies leaving no children, in that event *the money to return* and be equally divided between my sons."

*In limine,* two propositions each having an important bearing upon the case are either conceded or are too plain for dispute: (1) The trust here created was an active trust, in contradistinction to a naked or dry trust, which our Statute of Uses wholly executes (Freeman v. Maxwell, 262 Mo. l. c. 24; Webb v. Hayden, 166 Mo. 39; Pugh v. Hayes, 113 Mo. l. c. 431); (2) the issues raised by the pleadings are such, both sides concede in their briefs, as to convert the case into one of equitable cognizance.

Did the language used in the above-quoted clause of the will confer the power to invest, sell and reinvest; to buy "safe stock" or other profit-producing commodities or securities, as the trustee might "think best," and to sell the same, if, in the judgment of the

trustee, the interest of the trust estate so required?
If it did, were lands contemplated by the testator as
among the things which, by the broad language used,
the trustee might be permitted to buy? We think
both of these questions must be answered in the affirm-
ative. The clause, while seeming to voice precatory
advice to prefer safe stocks, yet by a further clause
left the character of the investment wholly to the judg-
ment and discretion of the trustee. But the construc-
tion thus put upon the will is not decisive of the case
for the two chief contentions made by plaintiffs cut
even deeper than this. In effect they urge that even
though the will might have given the original trustee
power to buy and to sell securities and to re-invest
the proceeds, or even to buy lands, it is yet a *non-sequi-
tur* to argue from this that Curtis Field, the second
substituted trustee, had the inherent power, or that he
got power under the orders and approval of a Kentucky
court, to sell lands situate in Missouri, which had been
thus purchased.

We understand both sides to agree that the circuit
court of Madison County, Kentucky, had plenary power
to appoint William C. Shields trustee. Of course,
since he is as to both parties the common source of
title, neither side may be heard to question his author-
ity to buy this land; they can only question the power
of a second substituted trustee to sell it. Plaintiffs
are of necessity compelled to ratify his act in buying
the land in controversy and to concede in effect that
he had the authority under the will to buy it. For
we think it must be granted that if his act of buying
the land was wholly *ultra vires,* and an unwarranted use
of the trust fund, then any subsequent act by which
the wrong was righted and the trust fund returned
intact into the hands of the trustee was warranted
and legally unobjectionable. It is apparent that we
are here concerned only with the sum of six thousand
dollars of this trust fund which was actually invested
in the Jacobs land; with the remainder of the fund
we have nothing to do, and except for the mere casual

use of this remainder as a component part of a simple sum in addition, in order to ascertain if the six thousand dollars ever subsequently got out of this land and got safely back in this fund, we need not hereafter again consider this balance of four thousand dollars.

Defendant doubts, and mildly voices that doubt in her briefs, whether William C. Shields, as trustee appointed by a Kentucky court to administer a Kentucky cash trust fund, had the legal right to invest that fund in the lands of a foreign State. We do not need, in the view we take of this case, to discuss this question. Pursuing it but a moment further, however, for the purpose of casting, if possible, a little more light upon the equities and upon other questions which we deem vital and which we find it necessary to consider, it is fairly obvious that the doubtful clause in this will by which the trust was created was construed by all parties as permitting this fund to be invested in land situate in a foreign State. By William C. Shields, trustee, because he did so invest it; by Lucy B. Shields, because she took possession of the land and made her home on it, both before and after she was discovert and took the surplus of $6000, as profits when it was sold; by the circuit court of Madison County, Kentucky, because it approved the purchase (as well as the subsequent sale) of the land; by the plaintiffs themselves, because they both ratified it and accepted, either as trustee or *cestuis que trustent* (or both), the proceeds of the sale of land bought with money derived from the subsequent sale of the Jacobs land with imputed knowledge of the source thereof; and even by Jacobs, the vendor of the land, for he, in effect so states in his deed of conveyance of it to the trustee. Likewise, as the record shows, the Kentucky court and all of the above parties took the view that the fund was, by the terms of the will, to be administered by a foreign court. The doctrine that the construction of an ambiguous contract, or other dark and obscure writing enjoining mutual action, may be aided by the interpretation put upon it by those

charged with the duty of acting under it, is well settled. [State ex rel. v. Gordon, 266 Mo. l. c. 412; Knisely v. Leathe, 178 S. W. 453.] But we merely mention the rule *arguendo;* we do not need to, nor do we, rely upon it as a decisive doctrine of the case. For the chief point of contention here is, not whether the first substituted trustee had the power to buy the land; it is, we repeat, whether, after it was bought, the second substituted trustee had the power to sell it.

As our statement of the case discloses, William C. Shields, the first substituted trustee, died in 1865, only a year after he bought the land. The court of Madison County, Kentucky, appointed James S. Rollins, as trustee, but on his refusal to act, and on September 20th, 1866, one Curtis Field, a son of the settler and the maternal uncle of these plaintiffs, was appointed by the Kentucky court as the second substituted trustee. We have seen also from the statement of the case that upon petition filed, containing reasons which the circuit court, of Madison County, Kentucky, evidently deemed valid and sufficient, Curtis Field, as second substituted trustee, was permitted to sell the land in controversy, which he accordingly did and got therefor $12,000, being exactly twice the sum originally paid therefor out of the trust fund, and leaving in the hands of said Curtis Field, as trustee, the sum of $18,000 as the then sum of the trust fund and accrued profits therefrom.

It is fairly obvious that there are no vital differences as between the respective contentions of plaintiffs and defendant, which are not easily solvable, or reconcilable, save and except the validity of the sale of the Jacobs land. And upon this, of course, the whole case turns. Touching the validity of this sale by Curtis Field, acting as trustee, two serious contentions are strenuously urged by the plaintiffs. These are substantially : (1) There was no authority inherent in Curtis Field, as second substituted trustee, to sell this land, i. e., neither the terms of the will itself, nor the applicatory law, gave him such a power, and

(2) the order approving the sale thereof made by the circuit court of Madison County, Kentucky, was wholly void, because that court could make no order and render no judgment, which could in any way affect the title to real estate situate in the State of Missouri. These, particularly the last one thereof, are serious contentions as matters of law. The first turns wholly upon a question of fact, viz., the terms of the will itself. But we think the facts before us obviate the necessity of our passing upon either of them. This for the reason that we are of the opinion that the doctrine of estoppel as announced by this court in the case of Hector v. Mann, 225 Mo. 228, and others apposite, but not so precisely in point, precludes plaintiffs from setting up or urging the invalidity either of the appointment of Curtis Field as second substituted trustee, or the invalidity (for any reason) of the sale of the land made by Field to More, under the order of approval of the Kentucky court, or under the authority of the will itself. [Proctor v. Nance, 220 Mo. 104; Cape Girardeau, etc., Railroad Co. v. Bridge Co., 215 Mo. 286; Fischer v. Siekmann, 125 Mo. 165; Clyburn v. McLaughlin, 106 Mo. 521; McClanahan v. West, 100 Mo. 309; Boogher v. Frazier, 99 Mo. 325; Nanson v. Jacob, 93 Mo. 331; Austin v. Loring, 63 Mo. 19.] That such a doctrine may be more nearly akin to ratification or election than to estoppel, as the well-known elements of this ancient doctrine are found in the books, may be frankly conceded, but the efficacy of the facts as a defense to bar recovery, by whatever name designated, is well-recognized both in the case-law and in the text-books. [Hector v. Mann, supra, and cases cited above; 16 Cyc. 784, 787; 10 R. C. L. 694.] Fully recognizing the latter criticism as well as clearly stating the applicable doctrine, it was said in the case of Hector v. Mann, supra, at page 24:

"Conceding that the deed was prematurely made under the present record, yet it does not follow that plaintiffs were entitled to a decree determining and vesting title in them or any of them. They are con-

fronted with the fact that they received the fruits of a judicial sale and now seek to repudiate the sale. They say they did not knowingly accept the proceeds of a sale in partition. But the record is against them. The sheriff's letters sent respectively to them refer to their interest in the 'Gowah Stewart estate,' to Mrs. Hector's 'dowry' and a commutation of the same, to the respective interests of the heirs in land sold at a term of the circuit court, to the fact that subrogation was 'decreed' and that a receipt was demanded to 'file in court.' If we recur to the receipts they sufficiently indicate that the money distributed arose from a 'partition' sale. They say so in so many words. If defendants did not know the meaning of all the terms used, they were sufficient to put them upon inquiry and they made none. The record does not show they were illiterate people, unfamiliar with the use of fair English words indicating a proceeding in court, a judgment, sale and distribution of proceeds to heirs, and it would be dangerous to justice to permit a mere statement from a witness that he did not understand or did not know what was plainly told him, to overcome the force and effect of such documentary evidence.

"But it is argued that in order to operate as an estoppel the purchaser should have known and relied upon the receipt of the purchase money and changed his situation to his disadvantage because of such reliance. I cannot agree such argument is sound. There are estoppel and estoppels and some forms of them are so defined by law-writers and jurists as to make one element in the estoppel the knowledge and reliance of one party upon the acts and conduct of the other—for instance, estoppel *in pais,* arising from misrepresentation by word, act, conduct or silence. But there are other forms of estoppel in which knowledge of the fact upon the part of the person invoking the estoppel, and reliance upon the fact and a change of situation based upon that reliance, is not an element. It may be that 'estoppel,' speaking with precision, is the wrong designation and that in attempting to .classify and give

names the doctrine we are about to invoke is improperly classified as 'estoppel' and that it does not come under that head but springs from election, ratification, affirmance, acquiescence, acceptance of benefits or what not. It is classed, however, by law-writers under the head of 'quasi-estoppel.' [Bigelow on Estoppel (5 Ed.), p. 693; 16 Cyc. 787, 784 *et seq.*]

"Says Bigelow: 'Many of the cases upon this subject, it will be noticed, are simply cases of ratification or acquiescence; and it is a questionable use of terms, as we have seen, to apply the word "·estoppel" to them. A few more cases will serve to enforce this observation. Thus, if heirs of age join in a deed of quitclaim with a trustee of the ancestor's real estate, to complete title made by a previous deed executed by the trustee, it is said that they will thereafter be "estopped" from contesting the validity of that earlier deed. So if a man assent with knowledge of the facts to the appropriation of an officer of the law of moneys arising from a judicial sale, he will be estopped thereafter from objecting.' "

With this rule of law before us how stands this case upon the facts? The learned chancellor below evidently found, as well he might, that a part of the profits accruing to Lucy B. Shields, from the sale of the Jacobs land, constituted the whole of the purchase-price of the Herndon land, which the plaintiffs sold after the death of Lucy B. Shields and divided the proceeds among them and the other heir, William C. Shields, Jr. That such was the fact, we think is upon this record too plain for doubt or dispute. The only question possibly to be mooted is whether this division was made by plaintiffs and the other heir with knowledge, or notice of facts imputing knowledge, of the source of the money with which the Herndon land was bought. What are these facts?

The deed from Herndon to Curtis Field, as trustee, so designates him and clearly recognizes him as such trustee. This deed was in plaintiffs' chain of title. The deed from Curtis Field, as trustee, to Lucy B.

Shields, bearing date of September 13, 1869, recites that "the deed was made to Curtis Field, trustee, etc., by E. W. *Herendon* and Laura E. his wife, when it should have been made by them to Lucy B. Shields, she having paid for the property to *Herendon* out of her own individual profits of the trust fund received from her father Curtis Field's estate, paid over to her by Curtis Field, trustee, aforesaid." This deed was likewise in plaintiffs' chain of title. This identical land had been, as the statement of the case discloses, conveyed only forty-one days before for the identical consideration of $5000, to "Curtis Field, trustee for Lucy B. Shields and her children, acting under the will of Curtis Field, Sr., deceased." Since these two deeds are within plaintiffs' chain of title to this Herndon land, we think they are bound to take notice of the facts stated therein. But this is not all. If we take the other view, that the purchase price of the Herndon land was not paid by Lucy B. Shields, out of money which she got from the trustee as profits from the sale of the Jacobs land, but that it was bought as the deed therefor from Herndon to "Curtis Field, trustee for Lucy B. Shields and her children, acting under the will of Curtis Field, Sr., deceased," sets forth, then this deed is also in the plaintiffs' chain of title. In either view the fact appears that the Herndon land was bought with the money derived from the sale by Curtis Field, of the Jacobs land. Whether it was in fact bought with $5000, out of the $6000 which Curtis Field got therefrom, or with a like sum out of the $6000 which Lucy B. Shields got therefrom, we regard as immaterial. Moreover, whatever title plaintiffs had to this land came to them from deeds which recited that Curtis Field was the trustee. For if this money came out of the sale of this land, and if the muniments of title in plaintiffs' chain of title indicate this, it was enough to put plaintiffs upon their inquiry, which inquiry would have developed facts showing, beyond cavil, that the purchase price of the Herndon land was so derived. It may be difficult after the lapse of

forty-four years, and after the trustee has been in the grave for almost a generation, to so reconcile the conflicting language of the several conveyances by which the title to the Herndon land got out of Herndon and into the trustee, as to say with certainty which fact is true, but if plaintiffs were put upon their inquiry by the language of these, or of any of these muniments of title, that inquiry would we think inevitably have shown the origin of the money which was used to buy the Herndon land. The record is so full of facts to show this, and other acts of plaintiffs from which quasi-estoppel arises, that we can not take space to recite all of them.  (a)  The deed from Herndon was *acknowledged* on July 3, 1869;  (b)  on the self-same day, More, the vendee of the Jacobs land, paid into the bank to the credit of Lucy B. Shields, the sum of $5000;  (c)  on this same day Lucy B. Shields paid over to E. W. Herndon the sum of $5000;  (d)  there was on file among the trust fund case papers in the Madison County (Kentucky) Circuit Court an appraisement of the Jacobs land which was sold, and of the Herndon land which was bought, in which the Herndon land was described as having been *"bought by Field as trustee, from E. W. Herndon, at $5000;"* and (e)  it was said by the appraisers that they regarded the latter purchase "as judicious and for the advantage of the trust fund." *All this in corroboration of the language of the deeds themselves.*  When plaintiff Frank H. Shields came of age, Curtis Shields, the second substituted trustee, asked to be relieved from the further burdens of this office, and requested the Kentucky court to discharge him and appoint said plaintiff.  Plaintiffs procured the appointment thereupon of Frank H. Shields, as trustee, and both plaintiffs executed a bond for his faithful performance of the duties as such trustee.  This bond recited that plaintiff Frank H. Shields has "been appointed as trustee of Lucy B. Shields, in place of Curtis Field."  While this bond does say that Curtis Field was "removed," this was not in accordance with the facts as the solemn

court records show them, and if the word "removed" means other than that Curtis Field *was discharged pursuant to his own request* it is erroneous utterly, or else the word is loosely used. Frank H. Shields gave a receipt to Curtis Field, in which, as the paper itself which we set forth in our statement shows, he, as third substituted trustee, acknowledged the receipt of the full sum of $10,000, principal of the trust fund. His receipt also shows that $3290 was invested in the "House & Lot, Columbia," the deed to which he acknowledges he received. Later, both plaintiffs, after the death of Lucy B. Shields, petitioned the circuit court of Boone County, Missouri, to appoint Frank H. Shields, trustee of this fund. In that petition they state that "one Curtis Field was thereafter appointed trustee by the circuit court of Madison County, Kentucky, but that the said Curtis Field is now dead; your petitioners also state that no person has been appointed trustee for the said Lucy B. Shields, nor for her children, since the death of said Curtis Field." This statement is of course palpably erroneous, for Frank H. Shields had, thirty years before, been appointed trustee by the Kentucky Court of Common Pleas.

Can plaintiffs under this state of facts, comporting notice and demanding inquiry, when inquiry would unerringly have led to knowledge, after selling the Herndon land and partitioning the proceeds among them, and William C. Shields, be heard in a court of conscience to assert that their title to the Herndon land came through one who was not a legally appointed trustee? Can they be heard to urge that Curtis Field, in the sale of the Jacobs land, and in the purchase of the Herndon land, was, in a way of speaking, a trustee *ex maleficio?* Can they, after recognizing Curtis Field as a lawful trustee, and after solemnly confessing the receipt from him intact, of the trust fund in the full sum of $10,000, be heard to urge that he was not a trustee, but that illegally assuming so to act, he dissipated this fund, and they should now be permitted to pick and choose any property in which it was ever

invested? Can they, after taking this money from him, and after selling the land in which a large part of the proceeds of sale of the Jacobs land was invested, be heard to urge that they are entitled to have the Jacobs land also, because for a season this money, which they confess receipt of, the money which bought the land which they sold and enjoyed, was once invested therein? We think not.

It is true that by a conveyance, likewise in plaintiffs' chain of title, from Lucy B. Shields, to Curtis Field, trustee, and bearing date January 10, 1875, the Herndon land is conveyed back to said Curtis Field, for a recited consideration of $2000. No reason is set forth in this conveyance for making the same, except the recited consideration alone. We can only speculate as to this reason. The most plausible inference in explanation of it is, that it was to secure a fresh advance in cash out of the principal of the trust fund, and that it had no relation to any antecedent transaction. Corroboration of the latter inference is to be found in the fact that on September 18, 1870, five years before this last deed was made back to Curtis Field, and some six months after the Herndon land was bought and paid for, Field, as trustee, made and filed a report to the Kentucky court, in which he says that *there was on hand in the trust fund and invested in bank stock, in Boone County bonds, and in bonds of the United States, the full sum of $10,000. He mentions no land in this report.* But in the next report made by him in 1875, showing the condition of the fund "from the year 1875," and filed, we may therefore safely assume after January 10, 1875—the date of the above deed to him—*he does report that $2000 are invested in a house and lot.* Also, there is offered by the testimony of plaintiff Frank H. Shields a modicum of corroboration to the view that this deed was so made in order to secure a fresh loan out of the principal of this fund. For he says that Curtis Field was in the habit of permitting Lucy B. Shields to overdraw, and

that the witness continued to allow her to do so after he became trustee.

In this state of facts, what was said by GANTT, J., in the case of Proctor v. Nance, supra, at page 114, seems peculiarly apposite:

"When those who are entitled to avoid a sale adopt and ratify it, equity will estop them from afterwards setting it aside. When a sale of land is made no person can be permitted to receive both the money and the land. And it has been held, in the application of this principle, that it makes no difference whether the proceedings under which the sale occurs are avoidable or wholly void, in consequence of the want of jurisdiction. In 2 Smith's Lead Cas. (5 Am. Ed.), p. 662, the author says that when those who are entitled to avoid a sale adopt and ratify it, by receiving the whole or any part of the purchase money, equity will preclude them from setting it aside subsequently, for reasons that are too plain for statement. [Stroble v. Smith, 8 Watts, 280; Commonwealth v. Shuman's Adm'rs., 6 Har. 343; Smith v. Warden, 19 Pa. St. 424.] 'When a sale is made of land,' said LEWIS, J., in Smith v. Warden, 'no one can be permitted to receive both the money and the land. Even if the vendor possessed no title whatever at the time of the sale, the estoppel would operate upon a title subsequently acquired. It was held by this court, in Commonwealth v. Shuman's Adm'rs, that equitable estoppels of this character apply to infants as well as to adults, to insolvent trustees and guardians as well as to persons acting for themselves, and have place as well when the proceeds arise from a sale by authority of law as when they spring from the act of the party. A party will not be allowed to indulge in bad faith and make innocent purchasers the sport of his tricks. When a sale is void the reception of the purchase money renders it valid. [Adlum v. Yard, 1 Rawle, 171; Furness v. Ewing, 2 Barr, 479.] These principles are founded on elevated morals, common honesty and pure good faith, and are co-extensive with the principles of the michief

which they are designed to counteract. . . . In this case the defendant Nance had the means of knowing whether the proceedings in the tax case were valid or void and so far bid at his peril, but he paid his money in good faith, and Hall, with knowledge that the defendant had bought and paid for the land and that this purchase money had gone to the satisfaction of the taxes on the land, demanded and received the surplus from the treasury, and thus must be held to have ratified the sale."

Other facts in evidence making for *quasi-* estoppel, and precluding recovery, can be found in this record; but we are of opinion that those set down ought to suffice in a court of equity, and that further discussion would only serve to lengthen the opinion without adding appreciable light or strength thereto.

Let the judgment of the circuit court be affirmed. *Walker, Woodson* and *Graves, JJ.*, concur; *Bond, C. J.*, dissents in a separate opinion, in which *Blair* and *Williams, JJ.*, join.

BOND, C. J. (dissenting)—I am constrained to dissent from the conclusion of my learned brother FARIS that plaintiffs are estopped from the assertion of title to the lands in dispute by the facts shown in the record.

They have been set forth with so much clarity and completeness in the opinion of the commissioner filed in Division One, that I adopt, as an expression of my views, what is said by him in discussing that question. In stating the facts and rules of law governing that point, the learned Commissioner with a slight verbal change said:—

"He was appointed trustee by the Kentucky court, to succeed William C. Shields, in September, 1866. In March, 1868, he reported to that court that $6000 had been invested, before his appointment, in the Columbia land, on which there was an excellent dwelling, that Mrs. Shields and her children were in possession of the same and that it had doubled in value. He also reported that the remaining $4000 of the fund was invested

in four United States registered 5-20 bonds, that Mrs. Shields desired that one of these be sold and the proceeds appropriated to improvements on the house and grounds, and suggested that the remaining bonds be sold and the proceeds invested in Madison County railroad bonds. He also asked that, as he contemplated removal from Kentucky, another trustee be appointed. The court permitted the sale of one of the bonds for the improvement of the real estate, but refused to permit the sale of the others, or to appoint a new trustee. On July first, 1869, the trustee reported that in compliance with the wishes of Mrs. Shields he had sold the real estate for $12,000, which the court approved, and ordered that he pay $6000 of the amount to Mrs. Shields as profit under the will. Of the remainder of the money received $4000 was invested in a stock of the Knobnoster Savings Bank, in Missouri, and $2000 in Boone County Agricultural bonds. This, with the $4000 United States bonds, constituted the fund in the trustee's hands on January 13, 1870. In 1880 the trustee was called upon by the court for an accounting and reported that in 1875 the fund consisted of the following investments: Boone County Agricultural bonds, $3000; First National Bank of Knobnoster, $5000; residence house and lot in Columbia, $2000; total, $10,000. He explained that the property described as the "residence house and lot, Columbia, Missouri," cost five thousand dollars, two thousand of which came from the trust fund and three thousand of which was paid by Lucy B. Shields, and that one thousand dollars was paid by her for improvements. This was untrue, as shown by the recital in his deed of September 13, 1869 (conveying to her the same land), that she had paid the *entire* purchase price "to Herndon out of her own individual profits of the trust fund" and that the deed should have been made by Herndon and wife directly to her. It is also shown to be untrue by his report of sale filed in the Kentucky court in 1869, in which he states that he had invested the entire six thousand dollars coming to the fund from More, in $4000 of

stock of the Knobnoster bank and $2000 of Boone
County bonds. These things cast us headlong into the
mire of speculation as to why, five or six years after
this money had been received and invested, he should
call upon his sister to convey to him her home to
carry in his accounts for two thousand dollars. There
is no intimation in the record that he actually paid
her any part of the amount arising from the sale of
the four thousand dollars of United States bonds on
September 28, 1870, and as for the securities in which
the More money was invested, they remained intact in
the fund. Had Judge Field, in this accounting, charged
that the deed from his sister had been made to secure
him for an advancement to her of two thousand dollars
from the proceeds of the sale of the Government bonds,
it would have been difficult at this late day to detect the
deception, but then the whole transaction, including
the securities themselves, was before the court, and the
commissioner charged with the audit, had he been ever
so friendly, could not have overlooked it. We are con-
strained to believe, and so find, that Mrs. Shields re-
ceived nothing from the trust fund for the deed to her
home property, which was afterwards carried as a two-
thousand-dollar item in the account of the trustee. This
will appear more plainly from the accounting made by
Judge Field in 1880, in evident preparation to shake
from his shoulders, as completely as possible, the
responsibility with which he had charged himself in
assuming this trust. We must bear in mind that it is
not the trust fund that is involved, but only the item
of six thousand dollars arising from the purchase
money paid by More, and which was invested in Knob-
noster bank stock ($4000) and Boone County Agricul-
tural bonds ($2000). In 1876 the Knobnoster bank
was in liquidation, the $5000 of its stock held in the
trust fund finally became a total loss, the Boone Coun-
ty bonds ($3000) disappeared from the fund; and
$1800 of Johnson County bonds, and $3500 of stock in
the Exchange Bank of St. Louis, were taken in. The
process of depletion continued. The Johnson County

bonds were defaulted, as to both principal and interest, and the Exchange Bank went into liquidation, and sixty cents of its par value ($2100) became a total loss. There being no income, Mrs. Shields had been compelled to overdraw "for the money to buy meat and bread for herself and children."

On March 29, 1880, Frank H. Shields, then twenty-one years old, was, on the application of Curtis Field, appointed by the Kentucky court trustee and gave the following receipt:

" 'Columbia, Mo., Feby. 10th, 1881.

" 'Received of Curtis Field (Aug. 2, 1880), trustee for Mrs. L. B. Shields:

" 'Thirty-five shares Ex. Bank of St. Louis, in litigation (40 Pr. Ct. Pd.) $2100; ($2000) Johnson County T. P. bonds $1800; deed to house and lot Columbia $3290; cash check $2750; do do $60; $10,000.

" 'FRANK SHIELDS, *Trustee.*'

"This is the only act he is shown to have done under this appointment except to file his bond.

"At the time of his appointment as trustee Curtis Field received the trust fund as it had been invested by his predecessor in Columbia land and Government bonds. His investments had all been unfortunate, so that at the time of his resignation Mrs. Shields, his beneficiary, was absolutely without means, from the income, to buy meat and bread, and he had been compelled to advance her $1347.05 from the principal for that purpose. It was natural that Judge Field should desire to unload, and fortify himself against responsibility to the ultimate owners of the dissipated fund. Frank, the oldest of these, had just arrived at the age of twenty-one years, while his two younger sisters, both living at the time, were, we presume, past eighteen. His legal instinct told him that if he could secure a release from these, only William, then a child a eleven, would remain a menace to him. It was under these circumstances, though not, of course, avowedly for the purpose concealed in them, that he secured the

275 Mo.—11

appointment of Frank, and the signature of his sisters
to his bond. The entire fund for which his receipt was
given was worthless or discredited, with the exception
of the cash in bank, and the so-called debt secured on
the mother's home, which had been increased, for that
purpose, to $3290. The money was paid over to the
mother, as might have been and probably was expected,
to buy meat and bread, which she so sorely needed,
and for which the provision made by her father had
failed without fault of herself or her children. The
Kentucky court, having apparently accomplished what
it considered to be its duty, let it drop, and whatever
hope may have been entertained of saving something
from the investments does not seem to have come to
fruition so far as this record shows.

"Soon after their mother's death her three living
children filed in the circuit court for Boone County,
Missouri, a petition in which they recited the appoint-
ment by the Kentucky court of Curtis Field as trustee;
that he was dead, and that no successor had been ap-
pointed, and asked the appointment of Frank H.
Shields as "trustee for Lucy B. Shields and trustee
for the children of said Lucy B. Shields." This was
evidently done upon the theory that the title to the
Herndon lot, her only estate, was in Curtis Field, and
that the appointment of a successor to convey it was
necessary. In June, 1912, Frank H. Shields filed a re-
port as such trustee, showing that he had sold the lot
for $6700, out of which the children had received
$1529.95 each, making a total of $4589.85.

"It is from these facts, and such explanatory
matters in the record as we shall refer to, that we are
to determine this question.

"At the time of the purchase by which More be-
came constructive trustee of the trust fund so far as it
was represented by this land, the children were infants,
ranging from four to ten years of age. The deed which
he received gave him ample notice upon its face, of
the trust with which the property was charged, and for
that reason, apparently, he required the personal war-

ranty of Mrs. Shields, but not of the trustee, to stand behind his title. He knew that he had purchased the life estate of Mrs. Shields at the most, and this knowledge was charged by law upon each person claiming title through him, including Cunningham. Up to the time of the appointment in 1880 of Frank Shields to the trusteeship there is no suggestion of anything which would forbid or make inequitable the assertion of an honest title in the children of Mrs. Shields whenever their mother should die and their contingent remainder should take effect by the will of the common testator and not by any act of hers. They knew, in contemplation of law, that Mrs. Shields and Field had no more right to convey or affect the title in remainder than strangers. Estoppel, when invoked as a muniment of title to land, either legal or equitable, is a fact to be proved by the same weight of evidence required to establish any other fact for the purpose of destroying the paper title required by the Statute of Frauds. It will not be presumed, and we see nothing in the record which suggests that these plaintiffs, or either of them, up to the time Frank H. Shields became of age and suffered himself to be appointed, so far as the Kentucky court could confer the appointment, to the trusteeship of this testamentary fund, said or did anything which could mislead any purchaser or claimant to his detriment. Even had they been of mature age during all this time the law would impose upon them no duty to devote their activities to the task of preventing potential purchasers from mistaking the legal status of this title. Their own interest was contingent, depending upon facts of life and death which could not ripen into certainty until the decease of their mother, and they were at liberty to devote all their energies to earning a livelihood in other fields until that should occur. We are not now holding that it would not be their duty to speak the truth if requested to do so by one contemplating purchase, even to the extent of employing counsel to instruct them in all the intricacies of

the many-sided title presented here. It will be time for that when such a question shall be presented.

"We are not disposed to look upon the action of Frank Shields and his sisters in the matter of his appointment by the Kentucky court in 1880 as such an acquiescence in the attempted sale of their interest by their mother and Curtis Field as should close their mouths upon the truth. It is impossible to read the record of that transaction without arriving at the conclusion that this matter was arranged for the purpose of getting Judge Field out of an embarrassing situation. He tells us in his report to the court that his investments had been such as to leave his sister without bread and meat. During his administration of the fund she had encumbered her home to the extent of $3290 to assist him in carrying the principal of the fund for which Frank receipted. That liability of his mother, $1800 of defaulted bonds and $2100 of the worthless residuum of the assets of an insolvent bank, which he had just skimmed of its dividends to the extent of $1400, constituted the principal part of the fund for which the receipt was given. We do not think there is anything in this appointment and receipt which amounted to acquiescence in the act of his predecessor in attempting to sell any interest in this land other than Mrs. Shield's interest. The life estate passed by the sale and the purchase money had been paid into this fund, and it had become the duty of the trustee who participated in the sale as such to administer either the fund or its proceeds. No action would lie in favor of her or her trustee to recover the land, because they had conveyed the possessory right to the purchaser, and had left to themselves no interest which could constitute a ground for relief on their part. Nor could the children intermeddle, for their interest had not been disturbed or injuriously affected. The sale had been consummated without intermeddling or any right to intermeddle on their part. Had Mrs. Cunningham talked with the Shields children before her purchase in 1893 and had they then told her that they had no

title in remainder and that she could safely purchase, another situation would have presented itself. Had she talked with them after her purchase their statements to the same effect would have been valueless to her unless and until she should change her position by acting or failing to act in consequence of such assurance. This question was fully examined by us in the De Lashmutt case, 261 Mo. l. c. 440-443, where the Missouri cases which settled it were cited and examined at length, and we would not be justified in incumbering this opinion with its repetition.

"If it be said that at all times since the passage of the Act of 1894, the plaintiffs, although not having any possessory right, might have brought their suit to obtain a judicial determination of their contingent interest, it is answered by the fact to which we have adverted in the preceding paragraph, that the law did not give to More and his successors in title the right to force them to this trouble and expense, and by the further fact which would seem to be conclusive of the equities between them, that these purchasers, knowing from the beginning that their title was defective, had the same right to proceed under the same statute for the same relief. Applying these principles, we see nothing in the failure of the parties or any of them up to the time of the death of their mother, to assert such rights in the property as ripened upon the contingency of their survival.

"Another question arises upon the facts relating to the distribution of the mother's estate after her death. There is no rule of equity more firmly settled and more just and reasonable, than that one who knowingly receives the purchase price of his own estate sold by one assuming to act under a valid power, estops himself, in equity, from denying the power. Is that rule applicable in this case? In answering this question we start with the assumption that Mr. Shields took the land from Jacob charged with the trust created by the will for Mrs. Shields for her life, with contingent remainder in fee to her children. Her title included,

as the event demonstrated, the right of possession during the entire period of forty-five years which elapsed until her death. This passed to More by the deed, and to his successors in such title. The twelve thousand dollars received was equally divided by her and the trustee who assumed to represent her, into principal and profit, and out of the half called profit, which was paid to her by the trustee, she purchased, for five thousand dollars, and improved the lot, on which she resided at the time of her death. As between her and her children, this was her own as *effectually* as if it had been purchased with the proceeds of rents collected by her during her lifetime. As for More, he had elected to take her covenant of title, which estopped her as to her own life interest, and secured him with respect to the entire fee. The estoppel expended itself upon his forty-five years of possession. The covenant is still in force if broken, and not barred by the Statute of Limitation, but it has not been made a feature of this controversy.

"Under these circumstances it does not lie in the mouth of More and those representing him in title as constructive trustees under the Curtis Field will, to say that the whole or any part of the six thousand dollars paid to Mrs. Shields absolutely for her life estate according to the terms of the will under which they claim, should now be repaid by her children whose interest had not been included in the deal which produced it. That it was not intended to be so included is clear. It follows that they have not estopped themselves by participation in the distribution of their mother's estate as her heirs. In this distribution they took directly from their mother, and not, either directly or indirectly, from their grandfather.

"Nor have the respondents sustained by the evidence the burden of showing that any of the other six thousand dollars of the purchase price was invested in the Herndon land. The self-serving statement made in the Kentucky court by Curtis Field more than five years after the purchase, that two thousand dollars of the

price had been paid out of the trust fund, is not evidence against these plaintiffs. If it were, its falsity appears in the recitals of his own deed upon which the legal title of Mrs. Shields stands. It also appears by his report to the court made at the time. His accounts, taken in connection with this fictitious statement, leave no doubt in our mind that the deed of Mrs. Shields, made at the time of the statement, by which she conveyed to him the same land for an expressed consideration of two thousand dollars, a sum which bore no relation to its value, was made for the purpose of helping her brother out of the trouble in which he had involved himself by having dissipated the trust fund in bad investments. She was destitute, as he told the court, of money with which to buy the simplest food, but what she had she freely gave. She bent her back, and permitted him to load it with his own burden.

"Nor does the evidence impress us that Frank Shields, as trustee, ever received a dollar of the six thousand for which their interest in the land was attempted to be sold to More. Immediately after the sale was consummated, the trust fund consisted of that sum, received in cash, and four thousand dollars well invested in United States five-twenty bonds. With the last item we have nothing to do. It is a side issue. He immediately invested the six thousand dollars in four thousand dollars of Knobnoster bank stock, which was lost as effectually as if it had been burned, and two thousand dollars of Boone County Agricultural bonds, which are not traced into the hands of his successor. Five years afterward (1875) he had sold the United States bonds, and with their proceeds purchased another thousand dollars each of the Knobnoster bank stock and the Boone County bonds, and balanced the account with the two thousand dollars from Mrs. Shields by her conveyance of her home property. It will be seen that this latter transaction had no connection with the investment of the six thousand dollars received from the sale to More, and that if she received this two

thousand it necessarily came from the proceeds of the United States bonds.

"All these things happened five or six years before the culmination of the scheme to unload the responsibility for this fund onto the shoulders of the plaintiff Frank H. Shields. In the meantime the Boone County bonds had disappeared, and their place had been taken by the eighteen hundred dollars of Johnson County township bonds, upon which no interest had been paid for years and the principal of which had long been due and defaulted, and twenty-one hundred of worthless residuum of defunct St. Louis bank stock, which represented not an asset, but a total loss. That either of these ever bore fruit of any kind does not appear in the record. In addition to these was cash, twenty-eight hundred and ten dollars, and whatever, if anything, constituted a valid charge on his mother's home as proceeds of this six thousand dollars. We have seen that two thousand dollars of this must necessarily have come from the proceeds of the bonds if she received anything in that transaction. The amount at which the home stood in the Frank H. Shields receipt was $3290. Subtracting from this the $2000 leaves $1290 as the amount some part of which might possibly have arisen from some other source than the Government bonds. Adding this to the amount of cash paid him to balance the account and we have $4100, or one hundred dollars more than the amount of the principal of the Government bonds which constituted that part of the original trust fund immune from any charge against the purchase money arising out of the More sale.

"We do not think there is anything in these facts that charges plaintiffs or either of them with notice of having received any of that part of the purchase price of the More land retained in the trust fund, in the distribution of their mother's estate, and so hold. If, however, the respondents desire an accounting in that respect they may, under the offer contained in the replication, have such accounting in this suit, without

the presence of additional parties, to be taken in accordance with the principles stated in this opinion, the amount, if any, so ascertained to have been received by appellants through the distribution of the estate of Lucy B. Shields or otherwise to be apportioned 'upon the land sold to More and the proportional amount properly chargeable to the land in controversy charged thereon.

"Although Mrs. Cunningham had constructive notice of the title of plaintiffs from the recitals of the deed through which she claims, we are satisfied that her possession of the land was in good faith under an honest belief that she was the owner in fee by virtue of the provisions of the same deed, and that she is entitled to relief to the extent that the value of the land is enhanced by permanent improvements made by her and her predecessors under the More title before actual notice of plaintiffs' claim. For the reasons we have stated in this opinion the judgment of the circuit court for Boone County should be reversed, and the cause remanded for further proceedings in accordance with the views therein expressed.''

For the foregoing reasons I dissent from the majority opinion in this case. *Blair* and *Williams, JJ.,* concur in these views.