RICHARD T. CARTER, Appellant, v. BOONE COUNTY TRUST COMPANY ET AL.—92 S. W. (2d) 647.

Court en Banc, March 18, 1936.

*Cullen, Fauntleroy & Edwards* and *Franklin E. Reagan* for appellant.

632

634

*Clark, Boggs, Cave & Peterson* for Boone County Trust Company.

636

*Wm. H. Sapp* for W. J. Carter, Executor-Trustee et al.

*William H. Becker* for Sarah F. Bright.

TIPTON, J.—In 1888, Joel H. Haden died in Boone County, Missouri, leaving a will which was duly probated. The appellant brought this action to construe the will in reference to the property referred to therein as the "Haden Opera House" and to cancel a lease on this property entered into between W. J. Carter, the administrator c. t. a. of the Haden will and the respondent, the Boone County Trust Company.

Briefly summarized the will is as follows:

1. Directs that his debts be paid.

2. He gives to his wife, Sarah Haden, for and during her life, the annual sum of six hundred dollars.

3. He gives his daughter, Margaret Carter, a like sum of six hundred dollars annually during her natural life.

"4. These annuities to my wife and daughter, I declare to be a charge on all my estate, and obligatory on all my devisees and legatees.

"5. I give, devise and bequeath to my Grand daughter Sallie R. Bright, wife of William A. Bright as and for her sole and separate property, free from all marital rights of her husband, for and during the term of her natural life, with remainder to the heirs of her body the south half of Section twenty-five (25) Township forty-nine (49), Range thirteen (13) being my home farm, valued at Eleven Thousand Dollars. To have and to hold the same unto said Sallie F. Bright, as and for her sole and separate property, free from all marital rights of her husband, for and during the term of her natural life, with remainder to the heirs of her body.

. "6. I give, devise and bequeath unto Robert L. Todd, as Trustee for my grandson, Joel W. Carter, the north half of Section thirty-six (36), Township forty-nine (49), Range Thirteen (13) valued at Ten Thousand Dollars and one thousand dollars to be expended in improving said land. The said Trustee to have and to hold said land for the use and benefit of said Joel W. Carter, during his life, allowing said Joel W. Carter the use and occupancy thereof during his life, or, if said Joel W. Carter does not choose to occupy the same, leasing the land and applying the proceeds thereof to the use of said Joel W. Carter during his life and at the death of said Joel W. Carter, said Trustee to convey the land to the heirs of the body of said Joel W. Carter, or, if said Joel die leaving no heirs of his body then equally to the brothers and sisters of said Joel W. Carter, such conveyances to be on the same limitations as are herein contained in devises of lands. It shall not be lawful for said Joel W. Carter to anticipate his income

from the rents of said land, for a longer period than one year, and said Trustee is forbidden to recognize or accept any assignment or conveyance or anticipation of said rent for a longer period than one year.''

7. By this item he devised certain land to Robert L. Todd, as trustee for his grandson, John William Carter, under the same condition as provided in Section 6 of this will.

8. By this item the testator directed his executors to purchase for his grandsons, Richard and Edward Carter a farm for eleven thousand dollars, under the same conditions named in Section 6.

''9. My beloved Grand daughter Zerelda L. Carter, having reached her majority, I direct my executors, at once, to pay to Robert L. Todd, whom I constitute and appoint as Trustee for her, Eleven Thousand Dollars to be held, used and invested by said Trustee in good, safe interest bearing securities, and the interest and income thereof to be paid over to said Zerelda at least semi-annually. Should Zerelda marry then said Trustee is required and authorized to invest so much of the trust fund in his hands as he and she may deem best in the purchase of a farm, or of a home for her, the title of such real estate to be conveyed to said Trustee to be held on the same limitations and conditions and for the same uses as hereinabove provided for in the devise to Sallie F. Bright in Section 5 of this will. Any remainder of said Trust fund not so expended to be retained by said Trustee and used as hereinabove provided.''

10. This item provides for executors to pay to Robert L. Todd, as trustee for his granddaughter, Mattie E. Carter, when she became eighteen years of age, the sum of eleven thousand dollars under the same conditions that he provided for Zerelda Carter.

11. By this item he gave his watch to his daughter, Margaret Carter.

12. He directed his farm, known as the Abraham Davenport farm to be sold.

''13. With regard to my property in the Town of Columbia, situated on the N. E. corner of Broadway and ninth streets, known as the Haden Opera House and two stories adjoining—I direct my Executors to lease the same, and out of the income therefrom to pay first the annuities herein given my wife and Mrs. Carter in Sections 2 and 3. of this will; and the balance thereof to distribute equally among my seven grand children herein named. I direct my executors to keep said property well insured so that in the event of loss by fire, they may have the means to rebuild the same, to the end that said property may always produce an income to meet the annuities given above to my wife and daughter Mrs. Carter.

''14. I direct my Executors, as soon as may be after my death, to pay the sum of Five Thousand Dollars to Mrs. Sallie F. Bright as

and for her sole and separate property and to and for her sole and separate use, five Thousand dollars each to the trustees above appointed for Joel W. Carter and Zerelda Carter; and five thousand dollars each to the trustees above appointed for Jno. William Carter, Richard Carter, Mattie E. Carter and Edward Carter, as each of four last named grand children shall reach their legal majority. Such Trustees shall hold and use the funds so received, so as to produce an income for the benefit and use of their *cestuis que trust*, and each may, in his discretion apply to the use of his *cestui que trust*, such part of the principal of said five thousand dollars, as he may think will be for the best interest of the *cestui que trust*.

"15. I direct my Executors to close up their administration of my estate excepting only the Opera house and adjoining stores as soon as may be; and to pay over the assets equally to Sarah F. Bright as her sole and separate use, and to the Trustees hereinabove appointed for Joel W., John W., Zerelda L., Richard, Mattie E., and Edward Carter. Said Trustees shall invest the funds so received and pay over the income to their *cestui que trust*.

"The Opera house and adjoining stores shall be kept and if burned rebuilt to produce the annuities above mentioned, until the death of my wife and daughter; and after that to be kept and leased without any sale or disposition thereof, and the income thereof to be divided equally among my seven grand children above named, and their legal representatives.

"16. Should any of my legatees or devisees above named, die without issue living, the property and interest herein above bequeathed to the one so dying shall go to the survivors; and be received by Mrs. Bright, and the Trustees of the others and held and used as is provided for the original bequest of Eleven Thousand dollars to each.

"17. My Executors are empowered to sell and convey all real and personal property not herein specifically disposed of. But I desire my stock in the Exchange National Bank of Columbia not to be sold and the income therefrom to be equally divided between my seven Grand children above named.

"18. I hereby appoint William A. Bright, Executor of this will."

The codicil did not effect the property under discussion. The testator was survived by his wife, Sarah Haden, his daughter, Margaret Carter, and his seven grandchildren, Sallie F. Bright, Joel W. Carter, John William Carter (also known as W. J. Carter), Richard Carter (the appellant), Edward Carter, Zerelda L. Carter, and Mattie E. Carter. The widow, Sarah Haden, died in the year 1914, and the daughter, Margaret Carter, died in the year 1920. The granddaughter, Mattie E. Carter, died childless and intestate in the year 1891. Upon the death of the testator, William A. Bright qualified as executor of the Haden will and continued to act as such executor until Feb-

ruary 21, 1916, when he resigned, then the testator's grandson, W. J. Carter, duly qualified as his successor in office and still is acting as such.

The "Haden Opera House and the two adjoining stores" referred to in the will was a building located on a lot at the northeast intersection of Ninth and Broadway streets in the city of Columbia. This building burned and another building was erected. In 1905, the executor, Mr. Bright, leased that building to the respondent, the Boone County Trust Company, for a term of twenty years, with an option in the lessee of extending the lease for three successive ten-year periods. On the back of the lot, at the time of the testator's death, was one small building. In 1904, the executor, Mr. Bright, erected another building on the back of the lot, and the money to finance this building was advanced by the testator's widow and she was repaid this sum out of the income from the new building.

A second fire in February, 1921, completely destroyed the building that was built to replace the Haden Opera House. At that time W. J. Carter, as administrator c. t. a., was in charge of this property. He received forty-two thousand dollars from insurance on the building. On April 12, 1921, he entered into a lease with the respondent, the Boone County Trust Company. Under the terms of that lease the Boone County Trust Company was given a lease for fifty years on the basement and first floor of the building that was to be constructed on the lot. The trust company advanced thirty-five thousand dollars without interest towards the cost of erecting the building. Under the terms of the lease the trust company was to pay five thousand dollars annually, rent for the first twenty years and then the property was to be revalued, and the rent adjusted accordingly. During the first seven years the trust company paid no rent, but took credit for the thirty-five thousand advanced by it. The building was erected from the money advanced from the trust company and the money received as insurance money. The building erected was a two story building, and the second floor was rented by W. J. Carter to various tenants. There was a provision in the lease that made it subject to the provision of the Haden will. The trust company, the grandchildren of Joel H. Haden and their descendants were all made parties to this litigation.

The appellant contends first, that under a proper construction of this will, he is entitled to one-sixth interest in fee in this property unencumbered by any trust or contingency; second, that the trustee had no right to invest the insurance money and the thirty-five thousand dollars rent money in the building and he is entitled to recover this money or have an interest in the real estate in fee to that extent; and third, that under his construction of the will, the trustee had no right to make a lease with the trust company and the lease is void

on that account, or if the trustee did have a right to make the lease, the consideration is so inadequate as to taint the lease with fraud and it is invalid for that reason.

. The trial court upheld the contentions of the respondents, that is, it held that under the will, the executor or his successor in office derived the power to manage, control, rent and otherwise handle this property in order to produce an income for the testator's wife, daughter and grandchildren during their natural lives; that the grandchildren and their respective bodily heirs were vested with the right to receive all the rents which this real estate should produce from and after the date of the death of the testator's wife and daughter; until the date of the death of the testator's last surviving grandchild, providing that if one or more should die prior to that time, leaving no bodily heirs surviving, then his or her share of the income should pass to the surviving grandchildren and their respective bodily heirs *per stirpes*; that at the date of the death of the testator's last surviving grandchild, the fee simple title to said real estate vested in the respective bodily heirs of the testator's grandchildren *per stirpes* and not *per capita*. The trial court also refused to cancel the lease. It is from this ruling of the trial court that the appellant has appealed to this court.

■ I. In construing a will, we must gather the testator's intention from the words used in the will. [Crowson v. Crowson, 323 Mo. 633, 19 S. W. (2d) 634; Chapman v. Chapman, 336 Mo. 98, 77 S. W. (2d) 87.] The rule of construction of wills to be observed is to ascertain the intention of the testator and to give the effects to such intention unless it conflicts with some positive rule of law; and it is necessary to take the will as a whole in arriving at such intention and not give any clause in the instrument undue preference. It is our duty in construing this will to give it a construction that will carry out the intention of its maker. [Chapman v. Chapman, supra; Triplett v. Triplett, 332 Mo. 870, 60 S. W. (2d) 13; Trautz v. Lemp, 329 Mo. 580, 46 S. W. (2d) 135; Sec. 567, R. S. 1929.]

Taking the will as a whole, it clearly shows that the chief concern of the testator was to provide for his wife, his daughter and seven grandchildren during their respective lives, and to so provide for them that they should not come to want, even if by their own efforts they should fail to provide for themselves. By items 2 and 3 of the will he gave $600 annuity to both his wife and daughter. While these annuities were a charge upon his whole estate, it was first made a charge upon the income from the Haden Opera House property. By items 6, 7 and 8 he provided trust estates for the benefit of his four grandsons for their natural lives, with the remainder to the heirs of their bodies. By item 5 he gave a life estate to his granddaughter, Sallie F. Bright, with remainder to the heirs of her body. By item 9

he gave $11,000 in trust to his granddaughter, Zerelda Carter and if she married the trustee was instructed to buy her a farm or home to be held on the same terms as the gift to Sallie F. Bright. By item 10 he made to his granddaughter, Mattie E. Carter, the same gift he made to Zerelda Carter.

Now coming to the property, the subject of this litigation, "The Haden Opera House" by item 13 of his will, the testator directs that this property shall be leased, and the income therefrom shall be first charged with the annuities given his wife and daughter, as provided in items 2 and 3, and the balance of the income to be distributed equally among his seven grandchildren. This item, in substance, provided that in case this building was destroyed by fire it should be rebuilt from the money obtained from the insurance so that this property could always produce an income to meet the annuities given his wife and daughter. By item 15 he provided that his estate should be closed up, except the opera house which was to be leased to pay the annuities to his wife and daughter until their deaths, "and after that to be kept and leased without any sale or disposition thereof, and the income to be divided equally among my seven grandchildren above named, and their legal representatives."

Items 13 and 15, standing alone, do not dispose of the remainder in fee, after the charges against this property have been disposed of. Appellant contends that item 16 of the will does not refer to the opera house property. To this we do not agree. This item reads as follows:

"Should any of my legatees or devisees above named, die without issue living, the property and interest herein above bequeathed to the one so dying shall go to the survivors; and be received by Mrs. Bright, and the Trustees of the others and held and used as is provided for the original bequest of Eleven Thousand Dollars to each."

The very first clause in item 16, says, "Should any of my legatees or devisees above named die without issue living. . . ." The words, "my legatees or devisees above named" must refer to those persons named in item 15. In that item the testator named each of seven grandchildren by name. To our mind, the phrase "my legatees or devisees above named," refers to the property disposed of in item 15, and the property there referred to is the Haden Opera House. We think item 16 has a very definite purpose in the will and in the scheme of the testator. In his specific bequest to his grandchildren he left his property to them for life and then to pass it intact to the heirs of their bodies. Moreover, for us to assume that item 16 does not refer to the opera house property, we would have to assume that the testator intended to die intestate as to a part of his property, when it is presumed in the construction of a will that the testator intended to dispose of all his property. [Chapman v. Chapman, 336

Mo. 98, 77 S. W. (2d) 87; Paris v. Erisman, 300 S. W. 487; Bond v. Riley, 317 Mo. 594, 296 S. W. 401; Tebow v. Dougherty, 205 Mo. 315, 103 S. W. 985; St. Louis Union Trust Company v. Little, 320 Mo. 1058, 10 S. W. (2d) 47.]

Having determined that item 16 of the will refers to the opera house property, we must determine the estate that each grandchild took in this property by terms of items 13, 15 and 16. In item 15 we find this phrase, "and the income thereof to be divided equally among my seven grandchildren above named, and their legal representatives. The question arises what is meant by the term, "their legal representatives?" To determine this question, we must look to the context to ascertain the meaning of the term as used in this will. It might mean the person or persons who may be appointed executors or administrators of the first taker upon his death or it might mean the heirs of the testator's grandchildren. We do not believe that the grandchild's executor or administrator was meant, because by item 16, if one of the grandchildren should die without living issue then his or her share should go to the surviving grandchildren. Under these conditions the property devised could not go to the executor or administrator of the deceased grandchild. We believe that term, "their legal representatives" as used in the will means the bodily heirs of the first taker, if the first taker left such, and if not, then to the brothers and sisters of the first taker. This broad phrase was used to cover either contingency. [Ewing v. Shannahan, 113 Mo. 188, 20 S. W. 1065.]

The appellant contends that under item 15 of the will he is entitled to an undivided interest in the fee of the opera house, subject to the annuities to testator's wife and daughter (both were dead at the time of the trial), and that if item 16 applied to the opera house then this item is void. The reason he assigns for this conclusion is that the grandchildren having been given a fee under item 15, that the language used in item 16 is insufficient to down the fee already given. It is a well-settled rule of law that when an estate in fee is granted by a will or deed, such an estate cannot be cut down to a lesser estate by a subsequent repugnant provision. To do so, the subsequent clause must be equally as clear as the granting clause, so that all clauses in the will can be harmonized. [Triplett v. Triplett, supra; Middleton v. Dudding (Mo.), 183 S. W. 443; Roth v. Rauschenbusch, 173 Mo. 582, 73 S. W. 664; Cornwell v. Orton, 126 Mo. 355, 27 S. W. 536; Cornwell v. Wulff, 148 Mo. 542, 50 S. W. 439; Green v. Sutton, 50 Mo. 186.]

It is therefore, necessary for us to first determine if item 15 does give to the appellant an undivided interest in the fee to this property (after the death of both the testator's wife and daughter). To sus-

tain his position the appellant invokes the rule that a "bequest of the income, use, or occupation of any specific property, without qualification or limit as to time,. is in effect a bequest of the corpus of the property." [Walter v. Dickmann, 274 Mo. 185, 202 S. W. 537.] It is true that item 15, in speaking of this property does say "to be kept and leased without any sale or disposition thereof to be divided equally among my seven grandchildren above named, and their legal representatives." The trouble with the appellant's contention is that he pins his faith to a single clause in the will and does not try to harmonize that clause with the other clauses in the will. The will must be construed as a whole, and harmonize the various clauses if possible. If the appellant's contention is correct then the rule against perpetuities is violated. The "well-settled rule is that where a will is open to two constructions, one which would violate the rule against perpetuities, and the other not, the latter will be adopted and the will upheld if it is valid in other respects. [Perry on Trust (6 Ed.), sec. 381.]" [Trautz v. Lemp, supra.] This will is open to a construction that does not violate the rule against perpetuities, and this construction is that the restraint in selling the property terminated on the death of the last surviving grandchild of the testator. All of the testator's grandchildren were alive at the time of his death, in fact they were all alive at the time he executed this will. Therefore, under this construction the rule against perpetuities would not be violated.

The appellant contends that in item 16, the clause "should any of my legatees or devisees above named die without issue living," as here used means dying within the lifetime of the testator, or at any rate during the lifetime of the testator's wife and daughter, then the contingency never happened, can never happen and appellant's title is absolute. However, we think it is immaterial if the appellant is correct in this contention, as we believe the testator gave to this appellant only an equitable life estate in this property (which will be discussed later). This interest, of course, .terminates on the death of the appellant. However, we have repeatedly held that in will cases where there is doubt or uncertainty as to whether the testator meant the death of the devisee before the death of the testator then the will is to be construed as meaning the death of the devisee before the death of the testator. [Deacon v. Trust Co., 271 Mo. 669. l. c. 687, 197 S. W. 261; Northcutt v. McAllister, 297 Mo. 475, 249 S. W. 398; Owens v. Men & Millions Movement, 296 Mo. 110, 246 S. W. 172; Palmer v. French, 32 S. W. (2d) 591, l. c. 592, 326 Mo. 710.] This is a rule of construction based on the theory that the law favors the vesting of estates at the earliest possible. time. But, if on reading the whole will, it appears that the testator did have in mind and was re-

ferring to another event, then the will must be construed as meaning death of the primary beneficiary before the occurrence of that other event. [Dameron v. Lanyon, 234 Mo. 627, 138 S. W. 1; Ewart v. Dalby, 319 Mo. 108, 5 S. W. (2d) 428.] This is true for the reason that the intention of the testator is always paramount.

In Dameron v. Lanyon, supra, we had under construction a will wherein the testator devised and bequeathed the residuary estate to his four named children, with a provision that "should either of my children die without issue before he or she shall have received his or her share of my estate, the share of such deceased child shall be equally divided among his surviving brothers and sisters. . . ." In referring to that clause of the will we said: "If that were all there was in the will on the subject it should be construed to refer to the death of a child before the death of the testator. . . ." In that case, however, the court held that reading the will as a whole the intention of the testator that the words expressing the contingency shall have reference to a time subsequent to the death of the testator is so clear as to make unnecessary the application of any subordinate rule of construction, and this ruling was based on the fact that in that will the executrix, without bond, was directed to keep the estate together for an indefinite period of time to use the income as she saw fit, and to make such advances to the testator's children as in her opinion would be best for their interests.

So in the case at bar, the executor was directed to keep the administration of the estate open so far as it concerned the opera house for an indefinite period of time, to rent the building and under item 13 to pay the annuities to the testator's wife and daughter, and the balance of the income to be paid to his seven grandchildren, and by item 15 he was to divide the income from this property after the death of his wife and daughter among his seven grandchildren. Under both items 13 and 15, the executor was required to rebuild the building in case it was destroyed by fire. So, we think that taking the will as a whole the testator had in mind the time of the death of a grandchild and not the death of the testator or his wife and daughter.

We think that construing the will as a whole the testator intended that his grandchildren should have only an equitable life estate in this opera house. The will as a whole clearly shows an intent on the part of the testator to provide for his grandchildren only for their lives. We have already held that item 16 refers to the opera house and it shows the only interest the testator gave to his grandchildren was a life estate because he there says, "to be received by Mrs. Bright and the trustees of the others and held and used as is provided for the original bequest of eleven thousand dollars to each." In each instance the "bequest of eleven thousand dollars to each" was a life

estate. By item 15 the executor held the property as trustee for the grandchildren. [Judson v. Bennett, 233 Mo. 607, 136 S. W. 681.]

This trust was an active trust. The executor necessarily had to rent this property, pay the taxes and to pay over the income to the testator's grandchildren and if the opera house was destroyed by fire to build a new one so long as the trust existed. The question then is, how long is the executor to hold the property in trust? It is evident it was the purpose and intent of the testator that the property should ultimately go to the issue of the grandchildren. The fee of this property was not to vest until such time as it could be determined whether or not any of the grandchildren should die without issue. The trust must of necessity continue until the death of the last surviving grandchild, because until that time it cannot be determined whether or not any grandchild will die without issue living. The words of the will create a trust for that period of time. We hold that the appellant has no interest in the fee of the opera house property and that his only interest is that of an equitable life estate.

II. The next question for our determination is the validity of the lease entered into between the administrator c. t. a. and the Boone County Trust Company. The appellant contends that even though he has only a life estate in the opera house property, yet the administrator had no authority to enter into the lease in question. To determine the question we must look to the powers given the executor in the will. " 'The trust itself, whatever it be, constitutes the charter of the trustee's powers and duties; from it he derives the rule of his conduct; it prescribes the extent and limits of his authority; it furnishes the measure of his obligations. . . . A trustee can use the property only for the purpose contemplated in the trust and must conform to the provisions of the trust in their true spirit, intent, and meaning, and not merely in their letter.' [3 Pomeroy's Eq. Jur., sec. 1062.]" [Murphy v. Delano, 95 Me. 229, 49 Atl. 1053, 55 L. R. A. 727.]

Under the will, the executor's duty is to keep the opera house property rented so it will produce an income, and this duty rested on the executor as long as the trust existed. We have already held that the trust existed until the death of the last surviving grandchild. If, during the time the trust existed, the building on this property were destroyed by fire, then it was the duty of the executor to replace this building. Also, it was his duty to distribute the income derived from this building among the testator's grandchildren, after the death of the testator's wife and daughter. (Both were dead at the time of the fire in February, 1921.)

After the building was burned, it was the duty of the administrator c. t. a. to replace the building destroyed. He could not lend the money

received from the insurance, even if by doing so a larger income could be obtained for the estate. The administrator testified that the respondent, the Boone County Trust Company, was the only prospect he had to whom he could lease the building before it was built. So he entered into a lease with that company.

This lease was executed on April 12, 1921, and provided that "the rental term herein created shall begin as aforesaid on January 1, 1922. If the contemplated building is not completed by January 1, 1922, said leasee is to be given possession thereafter as soon thereafter as said building is completed." The lease is for a term of fifty years from January 1, 1922, at a yearly rental of five thousand dollars. The leasee advanced seven years rent without interest and this thirty-five thousand dollars was used in the construction of the building. The building is a two-story fire proof building. The second story of the building is not covered by this lease, but is rented to other tenants. The lease contained a clause that the property is to be revalued at the end of twenty years, also at the end of the thirty and forty year period. The lease, also, provided that the inside of the building should be finished at the expense of the trust company, which was done at a cost of over nineteen thousand dollars.

The appellant contends in his brief that "The lease, by its very terms, is to begin *in futuro*, and it is the settled law of this State, and also the rule of the common law, that a trustee or a life tenant has no power to make or enter into a lease to begin *in futuro*." He relies upon our case of Taussig v. Reel, 134 Mo. 530, 34 S. W. 1104. In that case the life tenant, Eugenia Reel, executed a lease dated May 21, 1889, to begin May 21, 1891, for a period of fifteen years. She died July 9, 1892. In speaking of that lease we said: "It was good as against her during her life, but uneffectual as to the remaindermen." We do not see the application of the rule of law announced in that case to the facts of the case at bar. There is no contention on part of the respondents that the lease could extend for a longer period of time than the trust existed. In other words, the respondents contend that the lease is for fifty years only on condition that the trust is in existence for that period of time. In fact, the lease has a provision to the effect that it is made subject to the provisions of the will of Joel Haden. We hold that the administrator c. t. a. had the power to enter into a lease for the period of time that this lease was executed. The fact that the evidence shows that no other building in Columbia was leased for fifty years would not affect the validity of the lease.

The appellant urges that the lease is void because the trustee had no power to make a lease whereby a part of the rent (that is $35,000 advanced by the trust company) was used in the improvement of the

real estate. To state his contention another way, he contends that it was the duty of the administrator c. t. a. to distribute the income among the grandchildren of the testator, and no part of the income could be used in increasing the corpus of the estate. He urges that the using of this money was especially detrimental to him for the reason that he is the only grandchild who has no issue and he is now passed sixty years of age. On the other hand the respondent, the Boone County Trust Company, contends that the administrator had the power to use this money in the construction of the building. But it contends that even if he did not have this right and this provision is invalid it does not void the entire lease. It cites Sexton v. North Mo. Ry. Co., 194 S. W. 1082; Schibi v. Miller, 268 S. W. 434, to sustain that contention.

It is unnecessary to pass on these questions because under the evidence we think the appellant is estopped to deny the right of the administrator to use the thirty-five thousand dollars in the construction of the building. The appellant and his wife admitted that the administrator and his attorney, Mr. Dinwiddie, came to Mexico, Missouri, to explain the lease in general terms. They admitted that they were told there would be no income from the trust company for seven years as the rent would be used in the construction of the building. The appellant testified that at this meeting he objected to the use of the rent to construct the building, while Dinwiddie testified that he said it was all right to use the rent money, but thought that building should be delayed for a year because building material would be cheaper then. He also testified that he read to the appellant the contract for the lease and also told him the lease had not been executed. As this is an equity case, it is our province to weigh the evidence and make our own finding of facts. But as the conflicting evidence is oral we will defer to the findings of the chancellor, as we are satisfied it is not against the weight of the evidence. [Wegmann Realty Co. v. City of St. Louis, 47 S. W. (2d) 770, 329 Mo. 972; Neville v. D'Oench, 34 S. W. (2d) 491, 327 Mo. 34.] Under these circumstances we will follow the findings of the trial court on the question. There was testimony that the appellant knew when the building was started and knew that it was under construction for many months; that soon after the building was completed, he visited it and stated to an official of the trust company that it was a nice building, and made no objection in regard to the lease. The testimony shows that the appellant knew that the thirty-five thousand dollars was to be used in the construction of the building and that the trust company had no knowledge that the appellant objected to the lease or any provision in it. In fact there was no evidence tending to show that any of the heirs of the Haden will objected to the lease, but on

the contrary there was an approval of the lease by most of the heirs at a meeting held in Dinwiddie's office. The trust company advanced thirty-five thousand dollars and expended over nineteen thousand dollars in the completion of the building. Under the evidence, if only the insurance money had been used to rebuild, the administrator could have only built a one-story building which would not have been fire proof.

For the first seven years after the building was completed the appellant accepted his share of income from the opera house property from the administrator, and at no time during this period did he make any complaint about the lease. The source of this income came from the rent of the second story and the annex building. The eighth year, or the first year the trust company paid rent to the administrator, the appellant refused to accept his share of the income from this property. Evidently he refused to accept this check on the theory if he did he would ratify the lease. We do not see how this refusal would change his position as he admittedly received the income from the second story of this building. It would have been impossible to have had a second story on this building if the advanced rent of the trust company had not been used in the construction of the building. Surely he accepted the benefits of the lease for seven years.

In our case of Austin v. Loring, 63 Mo. 19, l. c. 22, we said:

"When a sale of land is made no person can be permitted to received both the money and the land. And it has been held, in the application of this principle, that it makes no difference whether the proceedings under which the sale occurs are voidable or wholly void, in consequence of the want of jurisdiction. In 21 Smith's Lead. Cas. (5 Am. Ed.), p. 662, the author says that when those who are entitled to avoid a sale adopt and ratify it, by receiving the whole or any part of the purchase money, equity will preclude them from setting it aside subsequently for reasons that are too plain for statement. [Stroble v. Smith, 8 Watts, 280; The Commonwealth v. Sherman's Admrs., 6 Har. 343; Smith v. Warden, 19 Pa. St. 424.]"

This quotation was approved in our cases of Proctor v. Nance, 220 Mo. 104, 119 S. W. 409, and Lawson v. Cunningham, 204 S. W. 1100, 275 Mo. 128. We think the facts in the case at bar come within the rule of law announced in above cases and the appellant is estopped to deny the right of the administrator to use the advanced rent to construct the building. We can see no useful purpose to discuss the numerous cases cited in the briefs on this point.

The appellant also contends the rental contracted to be paid by the trust company is so inadequate as to shock the conscience of the court and should be set aside. He contends the family relations between the officials of the trust company and the beneficiaries of the

trust estate are such as to prevent the lease being obtained at a fair rental value. W. A. Bright was president of the trust company and he was the husband of Sallie Bright, one of the grandchildren. He testified he thought the lease was reasonable from the standpoint of the estate and so told the administrator; that he was interested in both the trust company and the estate. Sam Hunt was Bright's son-in-law and he was vice president of the trust company and his wife was of course one of the remaindermen. While it is true the administrator testified that he had great confidence in Bright's business judgment and was told by Bright that the lease was a good one from the standpoint of the estate, yet we fail to find from the evidence that the judgment of Bright was substituted for that of the administrator. In fact, during the negotiation for the lease the trust company was not represented by Bright, but was represented by a committee appointed by the trust company.

The appellant contends the lease should be set aside on the ground of inadequacy of consideration and states the law to be that if the consideration is so inadequate as to shock the conscience of reasonable men, a court will set aside the lease.

Appellant relies on the cases of Mangold v. Bacon, 237 Mo. 496, 141 S. W. 650; Van Graafieland v. Wright, 286 Mo. 414, 228 S. W. 465; State to use v. Davidson, 315 Mo. 549, 286 S. W. 355, and contends they hold that where the inadequacy of price, for which property is sold is so great as to shock the conscience, such inadequacy amounts to proof of fraud. There are expressions in those cases to that effect, but in each there were conditions under which the sale was held, naturally tending to produce the inadequate consideration. But for the purpose of this case we will rule it on the theory that mere inadequacy of consideration alone will justify a court of equity in setting aside a sale or lease.

The author of 1 Page on Contracts (1 Ed.), Section 641, page 1114, says:

''The discussion of the facts which, in combination with inadequacy of consideration, avoid a contract has carried us well into the subject of the unconscionable contract. An unconscionable contract is said to be one 'such as no man in his senses and not under a delusion would make on the one hand, and as no honest and fair man would accept on the other.' To what extent inadequacy of consideration must go to make a contract unconscionable is difficult to state, except in abstract terms, which give but little practical help. It has been said that there must be 'an inequality so strong, gross, and manifest, that it must be impossible to state it to a man of common sense without producing an exclamation at the inequality of it.' Another form of stating the rule is that 'where the inadequacy of price is so great that the mind

revolts at it, the court will lay hold on the slightest circumstances of oppression or advantage to rescind the contract.' It is also said that a contract will be regarded as unconscionable if the inadequacy is so gross as to shock the conscience. . . . The general rule that if one of the contracting parties does not have mind sufficient to comprehend the nature of the transaction, or to guard and protect his rights, the courts will interfere in his behalf, is everywhere understood. The rule that if an undue advantage is taken of one's situation and circumstances, by and through which an unfair and unconscionable contract is obtained from him, equity, upon proper application, will afford relief, is likewise well understood.''

The appellant contends that the value of the building at the time it was completed was from $120,000 to $160,000. The land was valued at $35,000 and the cost of the building was $80,000, making a total cost of the building $115,000. The parties to this suit present their various views to show that rent is adequate or inadequate. The appellant contends that the building should be rented for ten per cent of its value. That the part of the building used by the trust company is substantially four-fifths of the building and therefore it should pay rent on a valuation of $90,000 to $100,000; that $5000 annual rent is inadequate especially where heat and janitor service is furnished. But the contention of the appellant that $5000 per annum is all the rent the trust company paid is not warranted by the facts. In the first place the trust company advanced $35,000 without interest for seven years; and also put over $19,000 in improvements. If the interest on $35,000 had been charged at six per cent for the seven years, and this amount amortized over the twenty year period and had the $19,000 with interest been amortized over the same period, then the trust company would be paying over $7000 annual rent up until the time the property is to be revalued. There was in evidence the values and rentals of the various buildings in the block west of this building and on the south side of Broadway. The testimony showed that this was the most valuable business property in Columbia and also that property rented higher on the south side of Broadway than it did on the north side. In referring to these buildings, the appellant in his brief says: ''The total value of all the buildings considered by the appraisers is $295,000 and the total rent is $24,390, which gives a gross income of rent on said buildings of 7 per cent.'' It is true that not all of those buildings furnished heat and janitor service. So, we see that the trust company is paying gross over seven per cent on the value the appellant puts on that part of the building used by the trust company, which is the average rent paid in the best business block in Columbia. The fact that rents advanced after the lease was executed and that the trust company later leased a small part of their floor space at a rate in excess of

what it was paying, could not bear on the question of inadequacy of consideration of the lease in question.

If the rent is figured on the basis of the square feet used we have these facts; that the average rent on the ground floor for the business block above referred to, the annual rental is seventy and seventy-five hundredths (70.75) cents per square foot, while the trust company pays seventy-eight and twelve hundredths (78.12) cents per·square foot annually.

While the trust company may pay a little less than average rent paid on the property in the business block referred to, based on the value of the property, yet it pays more if we use the square foot basis to determine the rent.

Taking the evidence as a whole, we cannot say that it comes within the rule announced in Page on Contracts, supra, wherein the author says: "It has been said that there must be 'an inequality so strong, gross and manifest that it must be impossible to state it to a man of common sense without producing an exclamation at the inequality of it.'" We think this is especially true when we consider the amount of money advanced by the trust company; that the lease might be terminated at an indefinite future time upon the death of the last surviving grandchild.

Upon the examination of the record as a whole, we think the judgment was correct and should be affirmed. It is so ordered.

All concur, except *Gantt* and *Hays, JJ.*, not sitting.