CLARK L. KINDRED, Appellant, v. BEULAH ETHEL ANDERSON and MARY A. TIMBERLAKE.—No. 40401.—209 S. W. (2d) 912.

Division Two, March 8, 1948.

Motion for Rehearing or to Transfer to Banc Overruled, April 12, 1948.

*L. F. Cottey* for appellant.

*Nat B. Rieger* and *Jayne & Jayne* for respondents.

[913] ELLISON, J.—This appeal from the circuit court of Putnam County turns on the construction of the will of Ann Timberlake, deceased, and involves title to 82.42 acres of real estate [914] in that county devised by her will under Sec's 519, 550.[1] The appellant unsuccessfully contended below that the land should go to the testatrix's blood grandchildren as against an adopted daughter of her son William. The suit was in two counts: the first to ascertain and determine title under Sec. 1684; and the second for partition under Sec's 1709, 1710. The cause was tried below on an agreed statement of facts, and the issues turn principally on the two clauses we have marked X and Y in the will as set out next below.

"1. I, Ann M. Timberlake of Putnam County, Missouri, do make and publish this my last will and testament.

"2. I give and bequeath unto my son, John M. Timberlake, the sum of One Hundred Dollars.

"3. I give and bequeath unto my daughter, Florence, the sum of One Hundred Dollars.

"4. I give and bequeath unto my daughter, Sarah E. the sum of $250.00.

(X)"5. I give and devise to my son William H. Timberlake, his heirs and assigns all my real estate situated in the County of Putnam, in the State of Missouri, of which I may be seized at my death.

"6. I further give and bequeath unto my son, William H. Timberlake, all my personal property of every description (including notes and money) at the time of my death;—provided he shall pay to Florence, John M., and Sarah E. the several amounts as above given to them.

"7. The above amounts is to be paid from the personal property and in the event that there is not enough personal property to pay the said amounts then my personal property shall be divided among John M., Florence and Sarah E. in equal amounts, which shall be considered full payment for the above amounts. If there is any personal property left after making the above payments then the remainder shall go to William H.

"8. It is my desire to pay the full amount of said gifts in my lifetime and if I pay the said amounts then they are to receive the sum of One Dollar each. Any amount that I shall pay them in my lifetime is to be deducted from the amount of the gifts above.

(Y) "9. In the event that William H. shall die without issue then the whole of my said property shall be divided equally among all the above children.

"10. I hereby appoint William H. Timberlake Executor of this my last will and Testament.

---

[1]References to our statutes are to R. S. Mo. 1939, and same section numbers in Mo. R. S. A. and Italics and parentheses in quotations are ours, unless otherwise indicated.

"11. In Witness Whereof I have hereunto set my hand and affixed my seal this 4 day of January 1898.

"(Signed)   Ann M. Timberlake."

The agreed facts are as follows. The testatrix was a widow 68 years old when she died on April 25, 1900, a little over two years after the will was made. The will was duly probated. She was survived by the four children mentioned in her will. But of these her son John (clause 2) never married, and died intestate without issue. Her daughter Florence (clause 3) married one ——— Kindred, who predeceased her. She died intestate before this suit was filed leaving a son Clark L. Kindred, the appellant herein, and two daughters and three other sons, all defendants below but not parties to this appeal. Testatrix's daughter Sarah E. (clause 4) married —— Morris, who predeceased her. She died intestate before this suit was filed, leaving three sons, all defendants below but not parties to this appeal.

Testatrix's fourth child William Timberlake (clauses 5, 6, 7, 9, 10), the prominent figure in the case, outlived the other children. He was a bachelor 39 years old at his mother's death, and died in 1946 at the age of 85. In 1925, when he was 64 years old, he married the defendant-respondent Mary A. Timberlake, a widow, who had a daughter by a previous marriage, the respondent Beulah Ethel Anderson. Nine years thereafter, in 1934, William adopted that daughter. He never had a child of his own blood.

[915] In 1946, about eight months after William Timberlake's death without blood issue, and with the parties and relationships standing as above stated, his nephew appellant Clark E. Kindred brought the instant suit against William's widow and adopted daughter, also joining as defendants his own eight brothers, sisters and cousins, the testatrix's grandchildren, none of whom appealed. Only William's widow, Mary A. Timberlake, and his adopted daughter Beulah appear here as respondents.

Appellant's theory below and here concedes that clause 5 of the will, standing alone, made an unconditional devise in fee simple of the testatrix's real estate to William H. Timberlake, under Sec. 3496. But he further maintains that devise was cut down to a defeasable fee by clause 9 of the will, which provided that if William should "die without issue then the whole of my said property shall be divided equally among all the above children." The "above children" here referred to were the testatrix's aforesaid son John and daughters Florence and Sarah, all of whom died after the testatrix's death but before the death of William, leaving the nine children who are the plaintiff-appellant and eight of the ten respondents. Appellant contends these nine parties, as descendants of Florence and Sarah, took title to the land for the reason that William did die "without issue" within the meaning of clause 9 of the will, in that the quoted words meant *blood* issue, or heirs of his body, whereas he left only his

*adopted* daughter, Beulah, citing Graves v. Graves, 349 Mo. 722, 728-9(1, 2), 163 S. W. (2d) 544, 546-7. This we may call the first branch of the case.

The two appearing respondents ignore it in their brief and limit themselves to the broad contention that, on a proper construction of the whole will, the contingency expressed in defeasance clause 9 thereof (William's death without issue) applied only in case he *predeceased* the testatrix, which he admittedly did not. Hence they contend William took the fee title under the will, citing as a leading case Owens v. Men and Millions Movement, 296 Mo. 110, 246 S. W. 172. In reply appellant concedes the Owens decision, if followed, would coerce the conclusion contended for by respondents, but asserts it is not in accord with the Missouri doctrine, and should be over-ruled. This is the second branch of the case.

█ PART 1. Taking up first appellant's contention that William's adopted daughter Beulah was not his "issue" within the meaning of clause 9 of the will, because she was adopted and not a child by blood. It is true the Graves case, supra, cited by appellant, so held of the will there involved, but it was a very different will. There the preceding estate was left to two devisees, remainder over to the "heirs of their body," with the further condition that if either should "die without issue", the land should go to the surviving devisee and to the "heirs of his body." Nevertheless an adopted son of one of the deceased primary devisees claimed the property of his adoptive parent.

Under those facts the decision very properly held the word "issue" was used in the will in the same sense as the accompanying words "heirs of the body"; and that the adopted claimant could not take the property because he was not an heir of the body. Reinforcing that conclusion the opinion pointed to the proviso in Sec. 9614 (first enacted by Laws Mo. 1917, p. 134) which provides: "Said (adopted) child shall thereafter (after adoption) be deemed and held to be for every purpose, the child of its parent or parents by adoption, as fully as though born to them in lawful wedlock. . . . *Provided*, however, that . . . said adopted child . . . shall (not) be capable of inheriting from or taking . . . property *expressly* limited to *heirs of the body* of such . . . parent by adoption." And long before that the same had been held of a deed using the words "bodily heirs." However that deed had been made before we had an adoption statute in this state. Clarkson v. Hatton, 143 Mo. 47, 54-8(3), 44 S. W. 761, 762(2), 65 Am. St. Rep. 635, 39 L. R. A. 748.

But no equivalent expression (using the word "body") appears in the instant will. Clause 9 thereof merely provided "in the event that William H. shall die without [916] *issue*," his property should go to the testatrix's other children. On this branch of the case, the result turns on the meaning of that word "issue", as used in the will. When the will was written our statute, now Sec. 3499, defined the

phrase "dying without issue", as used in a deed or otherwise, to mean "issue living at the death of the person named as ancestor"—in this instance William, the first taker—and it applied to executory devises as well as remainders.[2]  If, then, William left issue when he died in 1946, he qualified as the holder of the fee.  This would have been true if he had married and had been survived by a natural child, though born only the day before his own death.  And his adopted daughter Beulah was his "issue" at that time, because she had been adopted in 1934 under the liberal provisions of Sec. 9614, supra.

But was it enough under Sec. 3499, supra, that she had come into that status at and before his death?  Or were her rights defeated by the fact that when the testatrix's will was written in 1898 our adoption statutes[3] only authorized a person to adopt a child as his *own* heir or devisee, by deed, and did not make the relationship binding collaterally?  In other words, should the will be construed to speak prospectively and to refer to whoever might be William's "issue" under the law at the time of his death, or must Beulah's rights be measured by the testatrix's presumptive notions on whether under the law in 1898 and adoptee would be the issue of William as adopter, which rule of construction was followed recently in Leeper v. Leeper, 347 Mo. 442, 448(2), 451(3), 147 S. W. (2d) 660, 664(7), 133 A. L. R. 586, 598, where the meaning of the word "children" was involved. As appears from the A. L. R. annotatoin to that case the law on the question in other jurisdictions is somewhat in conflict, and the answer depends on the meaning of the particular words used, and of the will as a whole.  Assuming the testatrix knew the law, we think it not improbable in view of the above statute, that she may have used the word "issue" as referring to legal issue at the time of William's death.

But if we be wrong in that and follow the general rule that wills speak as from the maker's death, we must at least assume that the testatrix knew our then adoption statute qualified the word "children" in the statute of descents and distributions (now Sec. 306) and made it include adopted children.  Fosburgh v. Rogers, 114 Mo. 122, 131-3(2), 21 S. W. 82, 84, 19 L. R. A. 201, decided in 1893. This decision quoted liberally from a Massachusetts case which stated the same was also true of the word "issue" in the descent statute of that state.  And that is said to be the usual, though not the uniform rule, even when the descent statute uses the words "issue of his body", "living issue", "issue" or "descendants", unless a contrary intent appears therein—*not* including, however, the words "heirs of the body."[4]  The testatrix further must have known that under Moran

---

[2]Faust's Adm'x v. Birner, 30 Mo. 414, 418-9; Humphreys v. Welling, 341 Mo. 1198, 1210(5), 100 S. W. (2d) 123, 129.

[3]See: Sec's. 968, 970, R. S. 1889; Sec's. 5246, 5248, R. S. 1899; Sec's. 1671, 1673, R. S. 1909.

[4]2 C. J. S., p. 452, sec. 63; 1 C. J., p. 1398-9, sec. 128; 1 Am. Jur., pp. 662-4, secs. 63, 64

v. Stewart, 122 Mo. 295, 299, 26 S. W. 962, 963, decided in 1894, an "adopted child (would) inherit from the adopting parent . . . *the same as if born of such adopting parent . . . in wedlock*"; and for the purposes of inheritance would be the "child" of a deceased adopting husband to such extent that the latter's widow could not have election dower under (now) Sec. 325, to which she would have been entitled if her husband had died childless. These two decisions seem to be most nearly contemporaneous to the making of the will, and they have never been overruled. With that thought in mind, we pursue the question a little further.

The Fosburgh case, supra, was followed in 1916 (after the instant testatrix's death) by Bernero v. Goodwin, 267 Mo. 427, 432, 435(2), 184 S. W. 74, 75, which ruled these early adoption statutes by necessary effect wrote the words "either natural-born or adopted" after the word "children" into **[917]** the descent statute. Specifically, that case held the surviving child of a deceased adoptee would inherit from the subsequently deceased adopter as the latter's grandchild and heir, and could contest the adopter's will. And In re Cupples Estate, 272 Mo. 465, 470-1(5), 199 S. W. 556, 557(3) said that had become "the settled doctrine of this court;" that the adopter could *transmit* "the faculty of inheritance"; and that the adoption law (of 1871 in that case) responds to a human desire for children—and "for someone to nurture and cherish *as one's own flesh and blood.*" These rulings were made notwithstanding any implications to the contrary in Hockaday v. Lynn, 200 Mo. 456, 467-8(2), 98 S. W. 585, 118 Am. St. Rep. 672, 8 L. R. A. (N. S.) 117. That decision stressed blood lines and held an adoptee could not inherit from collateral kin of the adopter; which was already the law.

Still another later case, St. Louis Union Trust Co. v. Hill, 336 Mo. 17, 24(5), 76 S. W. (2d) 685, 688-9(6), quoted from a Maine statute providing that an adopted child becomes "to all intents and purposes, the child of his adopters, the same as if born to them in lawful wedlock." The decision characterized this as a *"legislative change in the blood stream."* It was dealing with an adoption under the more liberal 1917 statute, it is true, but the quoted part of the Maine statute is almost the identical language used in our Moran case, supra, with reference to the adopting parent (not collaterals) under the 1889 statute. In this St. Louis Union Trust Company case a testator H had bequeathed the income from certain property to his son H., Jr. for life, remainder in full to the latter's "heirs at law." The son died leaving two adopted sons, and it was held they would take under the *will* from the *testator*.

Leaning the other way, McIntyre v. Hardesty, 347 Mo. 805, 808-9(1), 149 S. W. (2d) 334, 335-6(2) enlarged upon the Hockaday case, supra; stressed blood lines; and held an adopted child was barred from inheriting not only from a collateral kin of the adoptive parent,

but also from the lineal ascendants of that parent—in that instance the grandmother of the adopter. But there was no will or deed to be construed in that case  It was an equity suit based on an oral contract to adopt. Further, Crawford v. Arends, 351 Mo. 1100, 1108(6), 176 S. W. (2d) 1, 6(8), held a child adopted under the 1909 law was not a ''lineal descendant'' of the adoptive parent within the meaning of Sec. 528, which provides that if an estate be devised to a child or other *relative* of the testator and the former predecease the latter, his lineal descendants will take the devise. This decision (opinion by the present writer) also stressed blood lines. But the word ''relative'' in that statute had consistently been held to mean blood kin; the will there disclosed no intention to depart from blood lines; the devisee was a first cousin of the testatrix; and his adopted son was her second cousin, who could not have inherited from her in the absence of a will.

It cannot be disputed that our statutes of descent and distribution have always *followed* blood lines, and do now. Nor can it be denied that an adopted child is not a blood child. But it is also true that the legislature can constructively ''change the blood stream'' for the purposes of inheritance. And as shown above, our decisions at the time the instant will was made disclosed that between a *parent* and child by adoption the relation was as if the child had been born in lawful wedlock. Furthermore it should be noted that in nearly all the foregoing cases where the right has been denied the adoptee was claiming against someone other than the adopter, by virtue of the adoption. In the Leeper case, cited several pages back, the plaintiff was claiming directly as purchaser under his grandfather's deed, by virtue of his adoptive relation to the latter's son, who was life tenant. In the McIntyre case the plaintiff adoptee asserted the right to inherit directly from his foster great grandmother because he had been adopted by her grandson.

On the other hand, in the St. Louis Union Trust Company case the adoptees were permitted to take under the will of their grandfather, with whom they sustained no adoptive relation. That was because they [918] came within the designation in the will of ''heirs at law'' of their own adoptive parent. But in the instant case the respondent Beulah Timberlake does not even claim under the will; nor does she claim beyond her foster father under the adoption. By the express provision of the will if her adoptive father William died leaving issue *he* took the fee in the land and he could have deeded or willed·it away in his lifetime subject to that contingency. Since he did not do that but died seized of the title, she inherited it from him as his adopted child—if that adoption satisfied the requirement of the will that William leave issue. And that, in turn, depends on what the testatrix meant by the word ''issue'', as used in her will. Brock v. Dorman, 339 Mo. 611, 614(2), 98 S. W. (2d) 672, 674(1).

It is true the word "issue" prima facie means blood issue. But it is not as restrictive as the word "children." Prima facie the latter means lineal descendants of the first degree—one's own children.[5] And yet, as we have shown, under the Fosburgh and Moran cases cited early in the opinion, which were current law when the instant will was written, the word "children" was understood to include adopted children as if they were of the blood. On the other hand, for the purpose of inheritance, the word "issue" generally has more broadly included lineal descendants of any degree[6] conforming to the statute of descents. In a number, but not the majority, of the decisions in the citation below,[6] the word "issue" has been held to include adopted children. However, all the decisions agree its meaning will be determined from a reading of the will as a whole in the light of attending facts.

In Grundmann v. Wilde, 346 Mo. 327, 332(4), 141 S. W. (2d) 778, 780(6), this court in construing a will said "by no stretch of imagination could it be ruled that the phrase 'lawful issue' . . . includes. an adopted child . . . " But the will there involved a close family blood group and disclosed no intention to displace one in favor of another. In Freund v. Schilling, 222 Mo. App. 901, 905(3) the Kansas City Court of Appeals said "The word 'issue' as used in wills is an ambiguous term." And in Wyeth v. Merchant, 34 Fed. Supp. 785, 789(3), affirmed (8th Cir.) 120 Fed. (2d) 243, involving a Missouri will, Judge Otis quoted and followed the statement of the law in 33 C. J., p. 822, supra, that in its strictest sense the word "issue", as referring to children, "applies to those who are of the blood;" but that the rule will yield "where there is a clear and manifest intention to the contrary expressed; and, accordingly, 'issue' may include adopted children." In the view of the writer the instant will sufficiently showed such intent, but a statement of the reasons for that conclusion will be deferred until the other branch of the case has been considered.

■ PART 2. Turning next to the Owens case, supra, 296 Mo. l. c. 118 et seq., 246 S. W. l. c. 174 et seq., under which appellant concedes he would be precluded from taking title, but which he contends is not in accord with Missouri doctrine and should be overruled. The gist of that decision is as follows. (1) When land is devised in fee to a first taker, but with a devise over to a second taker if the first taker die without issue, the condition will be presumed to mean the first taker shall predecease the testator; otherwise to take the fee uncon-

[5]"Child". 7 Words & Phrases (Perm. Ed.), pp. 56, 69, 78; 69 C. J., pp. 177-8, secs. 1200, 1201; 14 C. J. S., p. 1106; 11 C. J., p. 752; St. Louis Union Trust Co. v. Kelley, 355 Mo. 924, 934(3), 199 S. W. (2d) 344, 349(6); Trautz v. Lemp, 329 Mo. 580, 601(10), 46 S. W. (2d) 135, 140(9).

[6]"Issue". 22 Words & Phrases (Perm. Ed.), pp. 738, 757, 714-15; 48 C. J. S., p. 781-2; 33 C. J., p. 822. Also, more generally see Annotations: 133 A. L. R., p. 599; 161 A. L. R., p. 614; 166 A. L. R., pp. 151-3.

ditionally—this because the law favors the early vesting of estates; and is concerned that the testator's first and primary intent shall not lapse, even though he has made an alternative disposition in that event. (2) But the foregoing rule must yield to the cardinal rule that the testator's intention must be given effect [919] if not contrary to established rules of law and be expressed clearly enough to overcome the presumptive intent.

Appellant is mistaken in saying the doctrine of the Owens case is not in accord with the prevailing Missouri doctrine. It has been recognized as authority ten times by this court, in both divisions and en banc. In all of these cases one or the other of its doctrinal alternatives have been followed. We cite them all below.[7] The Owens case, itself, says the meaning of the will must be "doubtful". The other cases variously say the intent contrary to the presumption must be "clear and certain", or "clear and decisive", or "very clear"; or that it must be "as clear and certain" as the devise of the fee to the first taker, and free from "doubt and uncertainty." The Humphreys case (the latest one cited by appellant) alone is critical of the doctrine of the Owens case. It expresses the opinion that it "would appear logical to indulge a presumption that a testator is not ordinarily contemplating the event of the object of his bounty predeceasing him," and refers to earlier decisions in the books when the Owens case was decided, which it says "do not harmonize with that decision." Of the ten cited decisions the Shelton, Coleman, Long, Carter and Humphreys cases follow the second alternative of the rule, holding the contrary provisions of the respective wills considered overcame the presumption. The five others applied the presumption.

Now with reference to both branches of the case, what does the instant will disclose as a whole? When it was written both Mrs. Timberlake's sons, John and William, were single. William was 37 years old and a bachelor. When she died a little over two years later, he was 39 and still single. It probably was within her contemplation that he might never marry and have blood issue, and that he might adopt a child. St. Louis Union Trust Co. v. Hill, supra, 326 Mo. l. c. 26, 76 S. W. (2d) l. c. 689(7). She evidently had a deep affection for him, or some sense of obligation. For by clauses

---

[7]Ewart v. Dalby, 319 Mo. 108, 119, 123(7), 5 S. W. (2d) 428, 432-4(5); Coleman v. Haworth, 320 Mo. 852, 858, 864(5, 7), 8 S. W. (2d) 931, 933, 936(6, 13); Stevenson v. Stearns, 325 Mo. 646, 654(2), 29 S. W. (2d) 116, 118(7); Palmer v. French, 326 Mo. 710, 717-8(4, 5), 32 S. W. (2d) 593(1, 2, 5); Long v. St. L. Union Trust Co., 332 Mo. 288, 300(7), 57 S. W. (2d) 1071, 1077(6); Gardner v. Vanlandingham, 334 Mo. 1054, 1061(4), (3-6), 69 S. W. (2d) 947, 950(3-6, 10); Carter v. Boone Co. Trust Co., 338 Mo. 629, 644-6(2), 92 S. W. (2d) 647, 653-4(8, 11-13); Painter v. Herschberger, 340 Mo. 347, 352-3(2-4), 100 S. W. (2d) 532, 534-5(2, 5); Humphreys v. Welling, 341 Mo. 1198, 1208-12(5), 111 S. W. (2d) 123-130(8-9); Shelton v. Shelton, 348 Mo. 820, 823(4), 155 S. W. (2d) 187, 188(5).

2, 3 and 4 of the will she bequeathed the other three children only $100, $100 and $250, respectively. In clause 5 she devised all her real estate to William. In clauses 6 and 7 she also bequeathed all her personalty to him, save that required to pay the prior specified bequests to the other three children, and by clauses 7 and 8 she provided that if she paid those specific bequests in her lifetime, the recipients should get only $1 each. Following all this was the mooted clause 9 about William's dying without issue, in which event the whole estate should go to the other children with whom she had dealt with so meagerly in the will. And by clause 10 she appointed William as her executor.

Going back to the issue discussed in Part 1 of this opinion, concerning the meaning of the phrase "die without issue" in clause 9 of the will. On that question two theories may be drawn from the facts. The first is that the testatrix, knowing William was a bachelor in middle life and might never marry and have natural issue, inserted clause 9 in her will to meet that contingency.

The other theory is that the testatrix undoubtedly did want to prevent her will from lapsing as to William, with the result of substantially total intestacy—in which event her estate would have gone by inheritance without any will to the very three children she was practically disinheriting. So she inserted the executory devise over to those three children. But she did it reluctantly and as a last resort. [920] This is manifested by the facts that she gave him the whole estate, save for the nomial bequests to the three other children; that she, herself, was going to pay them off in her lifetime if she could; and that she made him executor. All this indicates a *dis*inclination to enforce blood lines of descent *from* William in favor of those children. She had already cut them off although they were of her own blood. And she knew William might not (as happened) leave any blood children. But she also knew if he adopted a child that child would inherit from him as if of his own blood—"as if born of (him) in wedlock," in the language of the Moran case. Without question her paramount desire was to conform to his wishes.

We are beset by inconsistent rules or presumptions on the two branches of this case. On the question as to what the testatrix meant by the phrase "die without issue", there are more than a few decisions holding the evidence must be clear and manifest to *disprove* it meant a death without *blood* issue—the eventuality which in this case was less likely to occur and which, if it did occur, would *defeat* the testatrix's main objective. On the other hand, under the rule of the Owens case the evidence must be clear and certain that she did *not* mean William must predecease her; otherwise the fee to vest in him unconditionally and the devise over to her other children to be wiped out—this to *protect* her main objective.

We think there was sufficient evidence on the first branch of the case to show the testatrix intended that the survival of William by a child, either natural born or adopted, or a lineal descendant there-, through, would vest the unconditional fee title in him. Specifically, we hold Beulah Timberlake was William's "issue". On the second branch of the case, the will hardly indicates the testatrix contemplated William would predecease her, for she made him executor without including any substitutional provision in that regard. And there is no other evidence fairly pointing to the contrary, especially if we be correct in our conclusion on the other branch of the case. We think the will did mean the testatrix's other children. should take the fee title to the land if William left no issue whatever, as herein defined. The judgment and decree below are affirmed, as to result, on the grounds herein stated.

All concur.

**PER CURIAM:**—In a vigorous motion for rehearing appellant's counsel complains because our opinion affirms the judgment below on the ground that William Timberlake's adopted daughter, Beulah, was his "issue" within the meaning of his mother's will. Counsel asserts that point was not raised below or even considered by the trial court; and that it was not tendered as an appellate issue. It is true the judgment below for respondent was not based on that legal theory, but solely on the doctrine of the mooted Owens-Men and Millions decision discussed in the opinion; and it is also true that respondents' brief was addressed solely to the latter contention.

Further it is the fact that the record brought up shows the appellant stipulated with respondents under Sec. 136 of the new Civil Code that he would make only two assignments of error on appeal, namely, that the trial court erred in adjudging that: (1) William Timberlake took a fee simple title to the land in controversy under his mother's will; (2) and did *not* take a defeasible fee, subject to be defeated by his subsequent death without issue. Appellant's counsel states in his motion that he prosecuted this appeal without charge because of his professional interest in the question whether the Owens-Men and Millions case states good law, and his conviction that it ought to be overruled.

But we are unable to see that counsel's stipulations below were limited to that question. His first assignment. thereunder broadly charged that the trial court erred in holding William took a fee simple title under and by virtue of the will. This was broad enough to cover the point on which our opinion decided the cause. And in his brief here, appellant said: "No claim [921] is made that William's adopted daughter is 'issue' within the meaning of that term as used in the will, and indeed, no such claim can be made. Graves

v. Graves, 349 Mo. 722, 163 S. W. 2d 544; Wyeth v. Merchant, 34 Fed. Supp. 785.''

Counsel declares he put that statement in his brief as a ''No Trespassing'' sign to keep this court from wandering away from ''the single issue thus *tacitly* marked out''—that is, the issue arising on the Owens-Men and Millions case. But we think appellant, himself, raised the question whether an adopted child could be ''issue'' within the meaning of the will, when he put that statement in his brief and cited authority on it. Furthermore, a lawsuit is not a mere contest between opposing counsel. The rights of the litigants are to be considered, especially in construing a will and carrying out the wishes of the deceased testatrix. And under Sec's 10b and 140(c) of the new Civil Code, and Supreme Court Rule 3.27, it has been held the appellate courts in their discretion may consider ''Plain errors affecting substantial rights,'' though not raised in the trial court or preserved for review. Guerry v. Hicks, 355 Mo. 1222, 1225-6(1), 200 S. W. (2d) 343, 345-6(2), 170 A. L. R. 391.

On the merits, we remain of the same opinion, in view of the provisions of the will and the attendant facts stated. The motion for rehearing is overruled.